# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Detention of Ehrlich*, 2012 IL App (1st) 102300

---

| | |
|---|---|
| Appellate Court Caption | *In re* DETENTION OF STEVEN EHRLICH (The People of the State of Illinois, Petitioner-Appellee, v. Steven Ehrlich, Respondent-Appellant). |
| District & No. | First District, Second Division<br>Docket No. 1-10-2300 |
| Filed | May 29, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's finding that respondent was a sexually violent person and the order committing him to a secure facility for treatment were affirmed, where, *inter alia*, respondent did not prove that the State had agreed not to seek commitment, the differences between the issues in his prior convictions and the commitment proceedings precluded his claim that collateral estoppel barred the State from relitigating the issues in his prior convictions, the admission of an updated version of his evaluation without proper disclosure in discovery did not warrant a new trial, and his commitment to a secure facility was neither unreasonable nor arbitrary. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 99-CR-80009; the Hon. Paul P. Biebel, Jr., Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Law Office of Stephen F. Potts, of Des Plaines (Stephen F. Potts, of counsel), for appellant.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Michael M. Glick and Katherine D. Saunders, Assistant Attorneys General, of counsel), for the People.

Panel

JUSTICE HARRIS delivered the judgment of the court, with opinion.

Justices Cunningham and Connors concurred in the judgment and opinion.

**OPINION**

¶ 1    The State filed a petition seeking respondent's commitment under sections 15 and 40 of the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/15, 40 (West 1998)). The State alleged defendant had been convicted of four sexually violent offenses, that defendant had been diagnosed with two mental disorders, and that respondent's mental disorders made it substantially probable that he would engage in future acts of sexual violence. The circuit court of Cook County found probable cause to detain respondent. After a bench trial, the circuit court entered a judgment finding respondent a sexually violent person. After a dispositional hearing, the circuit court ordered respondent be committed to the custody of the Department of Human Services (DHS) for treatment in a secure facility.

¶ 2    Respondent raises the following issues on appeal: (1) whether the circuit court erred in failing to dismiss the State's petition based on the alleged breach of a previous plea agreement or under collateral estoppel principles; (2) whether the circuit court erred in allowing the State to present evidence that respondent did not submit to an interview with a DHS psychologist or participate in any treatment in the DHS facility, where he was detained while awaiting trial; (3) whether the circuit court abused its discretion in denying respondent's motion for a new trial where the State allegedly failed to timely disclose an updated report from its expert; (4) whether the evidence was sufficient to prove that respondent is a sexually violent person; and (5) whether the circuit court abused its discretion when it committed respondent to institutional care in a secure facility rather than place him on conditional release.

¶ 3    We hold the circuit court properly denied respondent's motion to dismiss pursuant to section 2-619 of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/2-619 (West 2000)) because respondent failed to prove the existence of a plea agreement whereby the State agreed not to seek respondent's future civil commitment. Additionally, the respondent failed to prove collateral estoppel. We hold respondent has waived his argument that the circuit court erred in allowing evidence that he did not participate in an evaluation with the

-2-

State's expert or participated in treatment while in custody because he failed to object to the testimony at trial. We hold respondent is procedurally defaulted from raising the issue of the State's alleged discovery violation under the rule of invited error. We hold the State proved respondent guilty beyond a reasonable doubt. We hold the circuit court did not abuse its discretion when it ordered respondent to be committed to institutional care in a secure facility.

¶ 4                                    JURISDICTION

¶ 5        On June 30, 2010, after a dispositional hearing, the circuit court ordered respondent be committed to DHS custody for treatment in a secure facility. On July 22, 2010, respondent timely filed his notice of appeal. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rules 301 and 303 governing appeals from final judgments entered below. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 303 (eff. May 30, 2008); see also 725 ILCS 207/20 (West 1998) ("The proceedings under this Act shall be civil in nature."); *In re Detention of Hardin*, 238 Ill. 2d 33, 41-43 (2010).

¶ 6                                    BACKGROUND

¶ 7        On July 1, 1999, the State filed a petition seeking respondent's commitment under sections 15 and 40 of the Act (725 ILCS 207/15, 40 (West 1998)). In support of its petition, the State alleged respondent was convicted and sentenced to four sexually violent offenses. In 1980, he was sentenced to four years' probation for indecent liberties with a child by the circuit court of Du Page County. Also in 1980, he was sentenced to three years' probation for indecent liberties with a child by the circuit court of Cook County. In 1990, he was sentenced to 10 years in the Illinois Department of Corrections (IDOC) for aggravated sexual abuse/bodily harm by the circuit court of Du Page County. In 1998, he was sentenced to 17 years in IDOC for aggravated criminal sexual assault by the circuit court of Cook County. The State alleged respondent had been diagnosed as having the mental disorders of: pedophilia, primarily sexually attracted to females, nonexclusive type, and personality disorder not otherwise specified with narcissistic features. The State alleged that "[a]s a result of the Respondent's sexual offense history and his mental health diagnosis, which indicate that he suffers from a mental disorder, it is substantially probable that Respondent will engage in future acts of sexual violence." At the time of the State's petition, respondent was within 90 days of being placed into mandatory supervised release. Also on July 1, 1999, the circuit court entered an order for detention.

¶ 8        On August 4, 1999, after a hearing, the circuit court found there was probable cause to believe that respondent is a sexually violent person. The circuit court ordered respondent's detention to continue and for DHS to evaluate respondent pursuant to section 30(c) of the Act (725 ILCS 207/30(c) (West 1998)).

¶ 9        On May 31, 2001, respondent filed a motion to dismiss pursuant to section 2-619 of the

Code[1] (735 ILCS 5/2-619 (West 2000)). In his motion, respondent alleged that his four convictions, as listed in the State's petition, were all based on pleas of guilty. He alleged that at the time he entered into a fully negotiated guilty plea with the State in his latest conviction, the State did not inform him that it intended to seek his commitment under the Act. Respondent argued the State's petition must be dismissed based on this alleged breach. Respondent also argued that the State is precluded, by the doctrine of collateral estoppel, from asserting that he had a mental disorder at the time of the offenses for which he was convicted and that he has a mental disorder that creates a substantial probability that he will engage in future acts of sexual violence.[2]

¶ 10    Respondent attached to his section 2-619 motion the transcript from his latest conviction where he pled guilty.[3] According to the transcript, the assistant State's Attorney (ASA) explained the State's offer, stating "On a plea to Count One, the offer was seventeen years Illinois Department of Corrections. That would be concurrent *nunc pro tunc* with Case No. 88CF2342." The ASA then stated "[a]s part of the plea agreement, the [S]tate will be dismissing the remaining counts. That is essentially the agreement." Defendant then pled guilty.

¶ 11    The State responded that its petition seeking respondent's commitment under the Act is a collateral consequence of his guilty plea and, therefore, the State did not have an obligation to inform him of the possibility of a future civil commitment. The State argued that the doctrine of collateral estoppel was not applicable because the litigated issues in respondent's criminal convictions were not identical to those the State had to prove at a future civil commitment trial under the Act.

¶ 12    In reply, respondent acknowledged the State's argument that his guilty plea was a collateral consequence, but did not address it's merits. Rather, respondent maintained that the State violated its plea agreement based on contract principles and fundamental fairness.

¶ 13    On the first day of trial, July 12, 2006, the record reveals that respondent filed a motion to bar testimony based on an alleged violation of Illinois Supreme Court Rule 213.[4] Ill. S. Ct. R. 213 (eff. July 1, 2002). Respondent argued that Dr. Barry Leavitt's 2006 update to his evaluation of respondent violated Rule 213 and should be barred. Ill. S. Ct. R. 213 (eff. July 1, 2002). Dr. Leavitt did his original evaluation of respondent in 1999 and provided updated

[1]Respondent did not specify under what subsection of section 2-619 of the Code he was seeking dismissal under (735 ILCS 5/2-619 (West 2000)).

[2]Respondent also argued that the State's petition should be dismissed for being untimely, but he failed to renew the challenge before this court.

[3]In his motion, respondent alleges that all four of his convictions were based on fully negotiated guilty pleas with the State. However, he only attached the transcript of his guilty plea from his latest conviction.

[4]Although respondent's motion is not in the record, we do have the transcript of proceedings before the circuit court.

reports in March of 2002 and September 2004 and on July 6, 2006. The ASA explained to the court that the updates contained the following new information: an evaluation report from a medical doctor employed by DHS outlining respondent's medical condition, and "a line stating that [respondent] is able to ambulate for short distances with the use of a walker, but still utilizing a wheelchair for long distances." The ASA argued that Dr. Leavitt is responsible for making sure his reports are up to date and current.

¶ 14      Respondent, relying on Illinois Supreme Court Rules 218, 213(f), and 213(g), argued that expert opinions have to be supplemented at least 60 days prior to trial. Ill. S. Ct. R. 218 (eff. Oct. 4, 2002); R. 213(f), (g) (eff. July 1, 2002). Respondent's counsel indicated to the court that he received the updated report about a week before trial. The following colloquy occurred between the court and respondent's counsel:

> "THE COURT: What I would suggest is this. I will allow Dr. Leavitt to be redeposed if you're willing on the basis of whatever information that you can gather and we can move from there if you want to do it that way. I want the deposition to take place in a prompt fashion.
>
> Now, [respondent's counsel], do you want to do that, the element of surprise is taken out of it that way.
>
> *** I want full information from everybody. And if that will be helpful to me if you wish to have a deposition of Dr. Leavitt taken or whatever else you want to do, I will open it up for that purpose because I will make the judicial statement that this case has been set several times.
>
> RESPONDENT'S COUNSEL: Judge, I will go ahead and proceed today.
>
> THE COURT: You want to proceed today?
>
> RESPONDENT'S COUNSEL: I would just like the liberal opportunity on cross-examination with regards to his reliance on a new report.
>
> ***
>
> THE COURT: Sure, or we can start today and I could enter and continue for you to look at it if you want.
>
> RESPONDENT'S COUNSEL: If that becomes necessary, I will inform the court and request that.
>
> THE COURT: Fine.
>
> RESPONDENT'S COUNSEL: And I would like to proceed today."

¶ 15      The case proceeded to trial after respondent waived his right to a jury trial and the State withdrew its jury demand.

¶ 16      Dr. Barry Leavitt testified on behalf of the State. The parties stipulated that Dr. Leavitt is a licensed clinical psychologist and an expert in the field of evaluating sex offenders for the risk of reoffending. Dr. Leavitt conducts post-probable-cause civil commitment evaluations under the Act. On October 12, 1999, Dr. Leavitt conducted a clinical evaluation of respondent to determine whether respondent was a sexually violent person under the Act. Respondent agreed to participate in the interview. Prior to meeting with respondent, Dr. Leavitt reviewed respondent's IDOC master file, police reports, investigative reports, and

presence investigation reports. He believed that he also reviewed reports from the Department of Children and Family Services. Dr. Leavitt testified that the above documents he reviewed are generally relied upon and accepted by experts in his field to determine whether a sex offender risks reoffending. He completed the evaluation and issued a written report, finding respondent's mental disorders make it substantially probable that he will engage in future acts of sexual violence.

¶ 17    Following the initial evaluation in October of 1999, Dr. Leavitt completed three updated reports on respondent: in 2002 and 2004 and several weeks before trial.[5] The following exchange occurred between the ASA, the court, and Dr. Leavitt:

"Q. [ASA]: And in those three updates, did you have personal face-to-face interviews with [respondent]?

A. I did not.

Q. Did you attempt to?

A. On two occasions I did, yes.

Q. What happened?

A. [Respondent] refused to participate in those evaluations.

THE COURT: What years were those when he refused?

A. *** [I]n 2002 and I believe in 2004."

Dr. Leavitt testified that in conducting the updated evaluations, he followed the same procedures he did when he initially evaluated respondent in 1999. Additionally, he reviewed respondent's clinical file from the DHS treatment and detention facility.

¶ 18    Dr. Leavitt testified that during the course of his evaluation, he reviewed respondent's criminal history. Respondent's first convictions were in 1980 in both Du Page and Cook Counties for indecent liberties with children. It was Dr. Leavitt's understanding that the victims were a nine-year-old, an eight-year-old, and a four-year-old. Dr. Leavitt stated they "were all female children that had been sexually fondled and nude pictures had been taken of these children." He believed that both convictions were the result of guilty pleas and that respondent knew the children involved. Respondent was given a four-year probationary sentence in Du Page County, "as well as additional jail time as part of that probationary sentence." Respondent was also ordered to go through counseling "and mandated not to take any additional pictures of children." Respondent's conviction in Cook County carried a three-year probationary sentence. Dr. Leavitt testified that when he discussed the 1980 convictions with respondent, "there was a minimization on his part of having really done anything wrong. One of the words that he used to me was that he was just charged with simple fondling." Dr. Leavitt opined that "there was a severe minimization and denial of any other elements of the charges against him."

¶ 19    Dr. Leavitt testified regarding respondent's second conviction; aggravated criminal sexual abuse in 1988 in Du Page County. Respondent was approximately 40 years old at the

---

[5]Dr. Leavitt testified during respondent's trial on July 12, 2006.

time. Following a bench trial, in which respondent was convicted of one count of aggravated criminal sexual abuse toward his 10-year-old stepson, he was sentenced to 10 years' imprisonment. Respondent had also been indicted and charged with two-counts of aggravated criminal sexual abuse against his stepdaughter, but was acquitted of these charges. During the police investigation of the case, respondent admitted to sexually abusing his stepson. Dr. Leavitt testified that when he interviewed respondent, respondent denied having any sexual involvement with either child.

¶ 20    Dr. Leavitt also testified concerning respondent's second conviction in 1988, of a "non-sexual offense with strong sexual elements." Dr. Leavitt testified respondent was charged with disorderly conduct in Lake County because he attempted to photograph two 11-year-old female children. He did not know the children. Respondent had initially attempted to photograph the children and then attempted to photograph one of the children four or five days later. On this second attempt, respondent was in front of the children's home. Respondent had gotten out of his vehicle to try to photograph one of the children. Dr. Leavitt opined that "I think what is important here *** is these were children who were young, prepubescent children who would fit within a profile of victims." When he discussed the incident with respondent, respondent denied doing it. Respondent pled guilty and received probation for six months.

¶ 21    Dr. Leavitt testified regarding respondent's final conviction for aggravated criminal sexual assault in 1997 in Cook County. The victim was respondent's nine-year-old adopted daughter. The offenses occurred over a nine-month period in 1989 and 1990, but the abuse was not reported until respondent was placed on parole in 1994. Respondent pled guilty and received a 17-year prison sentence. When Dr. Leavitt discussed the circumstances of this conviction with respondent, respondent "denied having committed any criminal act towards his child."

¶ 22    As part of his evaluation of respondent, Dr. Leavitt also reviewed respondent's disciplinary history from his time in the custody of the IDOC and DHS. Respondent had "two significant misconducts." While in the IDOC's custody in 1998, respondent "was covering up the window in his cell with cardboard" and an officer saw respondent "jumping out of the bed and pulling up his underwear." Respondent had in his possession six pictures of young girls and an advertisement for a pornographic video. On two occasions in 2001, while in DHS custody, respondent had in his possession approximately 100 photographs of prepubescent girls concealed in legal documents. When Dr. Leavitt asked respondent about these "misconducts," respondent denied them. Dr. Leavitt opined that the infractions "speak to ongoing indications of deviant sexual interests, that despite having had numerous convictions, sanctions, all sorts of safeguards imposed, that it speaks in my opinion to indications of his ongoing uncontrolled deviant sexual interests." Dr. Leavitt was shown, as an exhibit, the pictures found in respondent's possession in 2001. In addition to pictures of prepubescent girls, there were also pictures of adults engaging in sex. Dr. Leavitt opined that both sets of pictures were relevant to his evaluation because he believed "it's connected to [respondent's] deviant sexual fantasies. And it is a way to help generate *** his deviant sexual interests." Dr. Leavitt testified further that he thought "the importance is that those adult pornographic or sexualized pictures can be used to generate the fantasy life of the

children, the numerous pictures of the children that were found in his possession."

¶ 23   Dr. Leavitt also testified regarding respondent's continued denial or minimization of his various offenses. He opined that it shows that respondent "continues to be unable or unwilling to acknowledge responsibility and to accept *** the problems that he has." He stated that respondent has "no insight, no awareness, no acceptance of the profound psychological and sexual problems that he has experienced."

¶ 24   In 1999, Dr. Leavitt performed three psychological tests on respondent: the general aptitude measure for adults; the Minnesota Multiphasic Personality Inventory (MMPI), a personality test; and the Malon Clinical Multi-Axial Inventory (MCMAI), another personality test. The general aptitude measure for adults test showed respondent functioned in the average range of intellectual functioning. Dr. Leavitt testified that the MMPI and MCMAI tests revealed two "primary findings." The first "indicated a general resistance to discussing and/or admitting to psychological problems." The second revealed "some evidence of deficits in [respondent's] personality, specifically with respect to self-esteem, sensitivity to criticism, feelings of inadequacy, and generally helplessness with respect to certain types of social judgment or social institutions."

¶ 25   Dr. Leavitt testified that he was familiar with the "Diagnostic and Statistical Manual of Mental Disorders, IV Edition-TR. (DSM-TR)," which he believed was authoritative in his field. Based on DSM-TR, Dr. Leavitt diagnosed respondent with two mental disorders: pedophilia, primarily attracted to females, nonexclusive type; and secondary personality disorder, not otherwise specified with narcissistic personality features. He testified these disorders are congenital or acquired conditions that affect respondent's emotional or volitional capacity and predispose him to commit acts of sexual violence.

¶ 26   Dr. Leavitt also used a several step process to evaluate respondent for the risk of reoffending. First, he determined whether respondent suffered from a mental disorder. Next he determined whether respondent's level of risk, *i.e.*, whether there was substantial probability that respondent would reoffend in the future based on his mental conditions. He testified that throughout the process, he analyzed respondent's scores on "specific risk instruments that are designed to help gauge the level of risk that a particular sex offender may or may not possess." He then looked at risk factors particular to respondent that would aggravate or mitigate his risk. Finally, Dr. Leavitt looked at "dynamic risk factors" which he described as important "in terms of understanding someone's level of risk beyond what the actuarials tell you, but they are also potential treatment indicators that can over time, if appropriately addressed, serve to reduce an individual's level of risk." He used several actuarial instruments in his evaluation: the Rapid Risk Assessment Sex Offender Recidivism (RRASOR); Static 99; and the Minnesota Sex Offender Screening Tool, Revised. He testified that the results of those three tests, taken together, placed respondent "within the high level of risk." Respondent's dynamic risk factors showed respondent as "having very severe deficits with respect to his levels of intimacy." He testified that "the primary motivating forces behind [respondent's] extensive sexual abuse is his *** deficits with respect to healthy levels of intimacy and relationships with age appropriate individuals." He opined that respondent "lacked a real capacity for and empathizing with others" because respondent "was so self-evolved, so self-absorbed that I think it prevented him from

appropriate empathizing with individuals." Respondent also "had a difficult time properly regulating and controlling his sexually deviant interests."

¶ 27    Dr. Leavitt testified that respondent did not participate in any sex offender specific treatment while in either IDOC or DHS custody. Based on his review of the record, Dr. Leavitt testified respondent had been offered treatment while in IDOC custody. While in DHS custody, respondent "has been offered treatment on at least a monthly basis over the last several years by members of his multi-disciplinary treatment team." Dr. Leavitt stated that respondent did participate in a mandated outpatient program while he was on parole in 1994, but that "the program was not sex offender specific." Respondent also participated in counseling in 1980 and 1981, but respondent's discharge summary showed that the treatment was not successful, that respondent did not complete the treatment, and that respondent "was identified as a high risk sex offender, who was massively resistant to any form of psychological intervention." Respondent's counsel did not object at any time to Dr. Leavitt's testimony concerning respondent's past treatment.

¶ 28    Dr. Leavitt testified that he was aware of respondent's physical conditions. These include diabetes, renal disease, kidney problems that required dialysis three times a week, vascular disease that resulted in the partial amputation of his right foot and a toe on his left foot, and hypertension. Respondent was partially ambulatory in that "he could walk short distances either on his own and through the use of a walker but that for longer distances was more comfortable and needed the use of a wheelchair." He did not think respondent's medical conditions mitigated respondent's risk of reoffending. He explained that "there is no clear evidence that these conditions affect[ ] his interest and/or ability to engage in sexual deviant behaviors." He found "it is equally possible that [respondent's] presumed state of helplessness or being in a wheelchair could be a further tool in his manipulative armor." He stressed respondent's use of manipulation to gain access to children. Additionally, he stated that respondent's physical conditions "may affect his libido, but what we do know is that sexual dysfunction does not correlate with a reduction in sexual recidivism risks."

¶ 29    In conclusion, Dr. Leavitt opined that "at the present time that [respondent] does possess a substantial probability of engaging in future acts of sexual violent behavior." When asked what he meant by "substantial probability," he answered that respondent "is much more likely than not to engage in future acts of sexual violence without appropriate secure care and intervention."

¶ 30    On cross-examination, Dr. Leavitt testified that when he first interviewed respondent in 1999, respondent was 51 years old and he did not believe that respondent was in a wheelchair or had any amputations. Respondent was also not receiving any dialysis for renal disease when Dr. Leavitt first met him. He agreed to defense counsel's question that "it would be fair to say that [respondent's] medical condition was substantially different in 1999." Dr. Leavitt admitted he was not a medical doctor, nor is he licensed to do medical work. He could not recall if respondent was in a wheelchair or had any amputations in 2001.

¶ 31    When asked by respondent's counsel whether the risk instruments he used "only place a person in a specific risk category," Dr. Leavitt agreed. He testified that the risk instruments "can give you informed information about a category of risk that a particular individual falls

into." He explained that the "the risk instruments are really to kind of give you a broad base estimate of risk assessment." He testified that the risk instruments he used in his evaluation can be used on someone with respondent's physical ailments because "there is nothing in the instruments themselves that would rule that out." Respondent's counsel asked Dr. Leavitt whether age is a risk factor to consider, to which he responded that "[i]t is certainly a risk factor that is very controversial within the field today." Dr. Leavitt opined that "it is unclear as to the affect age has on the likelihood of [respondent's] reoffending, particularly in light of the fact that [respondent] was continuing to reoffend on an escalating pattern well into his 40s." He testified that he was aware of findings in the field that show recidivism decreases after the age of 50, and significantly decreases after the age of 60, but noted that there are other more recent findings of the opposite conclusion. He stressed that there is "not a solidified opinion at the present time." He admitted that respondent did not have any convictions after the age of 50.

¶ 32    On redirect examination, Dr. Leavitt was shown an exhibit that showed the date of the amputation of respondent's right foot. He read into the record that respondent's amputation was on April 5, 2001. He testified that the photographs of children were found in respondent's room after the amputation of his right foot.

¶ 33    The State then presented into evidence certified copies of respondent's convictions before resting.

¶ 34    Larry M. Davis, M.D., testified on respondent's behalf. Dr. Davis testified that he is a psychiatrist, physician, sex therapist, and researcher. The parties stipulated that Dr. Davis was qualified to testify both as a medical expert and as a psychiatrist. Dr. Davis began evaluating respondent in 2004 after respondent's previous evaluator passed away. During the course of his evaluation, he interviewed respondent personally for 90 minutes, "reviewed a variety of written materials," obtained a testosterone serum level, which had been court ordered, and reviewed reports from other examiners and respondent's medical records. He tested respondent's testosterone serum level because "[t]he issue of human libido, drive, behavior, [and] function in the sexual area has much to do with the testosterone levels of men and women." Respondent had commented to him "that he had no erection response but also diminished libido and desire with the former problem going back into '89, '90, or '91 period," which Dr. Davis found "was a critical piece of information in understanding the libidinal drive to behave sexually."

¶ 35    As part of his evaluation, Dr. Davis made a medical diagnosis of respondent. He diagnosed respondent with: diabetes mellitus, type I; insulin dependency; nephrotic syndrome, which causes kidney problems such as dysfunction or failure; chronic vestibular problems due to gentamycin, which causes problem with his balance; and hypertension. He found respondent's amputations significant because they showed "the intensity of the peripheral vascular disease associated with the diabetic process." He testified respondent would only live "a few days without *** dialysis *** because the kidneys are not functioning." He explained for the court that respondent's right foot "ends in a round–it's as though the foot is mostly gone." Respondent's left foot was "generally intact," except that his distal big toe was amputated. Due to the amputations, respondent "is not able to go far from his wheelchair." He did not agree with comments in reports from other examiners that

-10-

he reviewed in his evaluation that found respondent's prognosis "fairly good." He opined that respondent is "fully dependent" on others to stay alive and that he thought "it's a pretty terrible diagnosis when at a young age of 58, you're already losing body parts by amputation or from diabetes and have complete renal failure."

¶ 36    Dr. Davis also evaluated respondent's current psychiatric condition and concluded he did not "have any issue" with respondent's pedophile diagnosis, but would place it in the "historical category because *** I have no evidence since I've been evaluating him that it's an active thought process." He also opined respondent had "a strong pattern of paranoid personality disorder." He did not believe respondent is substantially probable to reoffend. He factored in respondent's age, and his testosterone levels, which he found to be low, in forming his opinion. He testified that respondent's "behavioral difficulties that come from being a bitter, angry, paranoid, older man in a wheelchair without the ability to move about without assistance, without the ability to live without assistance," reduce his recidivism rate. He concluded that respondent had a 6% to 8% chance of reoffending.

¶ 37    On cross-examination, Dr. Davis admitted that respondent's comments about ability to have an erection were "[t]otally subjective." He testified that respondent does not take his medicine or follow the proper diet given his medical conditions. He also clarified that respondent "is able to use a walker, but not extensively." He admitted he is not an expert in predicting sexual recidivism, stating "my expertise is not a Ph.d who does a lot with actuarial devices." He agreed that males with low testosterone still desire to have a sex life.

¶ 38    On redirect examination, Dr. Davis clarified that his opinion of respondent's likelihood of reoffending is based on his medical perspective expertise. He also believed respondent's medical condition would continue to decline in the future. He also stated that he thought "actuarial data [are] useful." However, "they don't have a reduce probability factor in them for things such as medical condition or other circumstances." He agreed when asked whether it was his opinion "that actuarials would be used in conjuncture [*sic*] with a clinical, psychiatric as well as medical approach."

¶ 39    On re-cross-examination, Dr. Davis admitted that he did consider Dr. Leavitt's actuarials and stated that "I don't take issue with Dr. Leavitt's actuarial report." Respondent rested.

¶ 40    On December 6, 2006, the circuit court entered an order finding respondent a sexually violent person and committed him to DHS custody "for control, care, and treatment until such time as he is no longer a sexually violent person." The order provided that DHS shall conduct an examination of respondent pursuant to section 40(b)(2) of the Act (725 ILCS 207/40(b)(2) (West 2006)), "as to whether the Respondent's commitment should be for institutional care in a secure facility or for conditional release," and that "Dr. Leavitt shall update his DHS evaluation."[6]

¶ 41    On January 3, 2007, respondent filed a motion for a new trial. Relevant to this appeal, respondent argued that the State breached its plea agreement with him and that the State should be barred, under the doctrine of collateral estoppel, from asserting that respondent

[6]Respondent was also ordered to provide a biological specimen according to section 45 of the Act (725 ILCS 207/45 (West 2006)).

"has a mental disorder which he had at the time of the offenses for which he was previously convicted" and "that he has a mental disorder that creates a substantial probability that he will engage in acts of sexual violence." Respondent argued further that the circuit court erred by allowing the State to present testimony that he did not submit to an interview with a DHS psychologist and that he did not participate in any treatment while awaiting trial at the DHS facility. Respondent asserted that the State should have been barred from presenting Dr. Leavitt's updated report because of its untimely disclosure. Respondent's final argument was that the evidence was not sufficient to prove his guilt.

¶ 42        In response, the State argued that respondent's future civil commitment under the Act was a collateral consequence of his guilty plea and, therefore, the State did not have to inform him of its possibility. The State argued that it was not collaterally estopped from seeking to commit respondent because the issues in respondent's commitment proceeding were not identical to those raised in his prior criminal conviction proceedings. Accordingly, the minimum requirements of collateral estoppel were not met. In response to respondent's argument that the circuit court erred in allowing the State to present testimony of respondent's failure to be evaluated by DHS and participate in treatment while awaiting trial, the State argued that the record of proceedings shows that at no time did respondent object to the testimony on the matter. Accordingly, the State claimed respondent waived his argument. Further, the State argued that "[r]espondent does not have a non-hearing right to remain silent and therefore there was no violation." The State argued that respondent relied on improper authority to argue that Dr. Leavitt's updated report should be barred because "there was no case management conference order requiring that discovery be completed 60 days before trial." The State also argued that the evidence supported the verdict.

¶ 43        In reply, respondent clarified that he was "not claiming that because he was not admonished at his plea that he could be subject to the terms of the Act is a violation of his rights. [His] position is that he had a fully executed and comprehensive deal with the [State] for a plea which was [a] breach by the [State] when it filed this action." Accordingly, he argued that the action should have been dismissed based on contract law principles. In regard to the other arguments, respondent maintained his positions outlined in his motion for a new trial. Respondent did not address the State's contention that he waived his argument that the State presented improper testimony by failing to object at trial.

¶ 44        On November 2, 2007, the circuit court issued a written memorandum opinion and order denying respondent's motion for a new trial. Relevant to this appeal, the court found that the State did not breach its plea agreement with respondent because commitment under the Act was a collateral consequence of respondent's guilty plea. Collateral estoppel also did not bar respondent's commitment under the Act because issue preclusion only applies to identical issues already litigated. The court found that the "issue of Respondent's current mental condition and his propensity for sexual violence is different from his previous mental state and his guilt in a previous act of sexual violence." The court also found that respondent's right to remain silent was not violated by the State's presentation of testimony that respondent refused to be evaluated or treated by DHS. The court found that under section 25(c) of the Act, respondent's right to remain silent only applied to hearings, not to clinical examinations (725 ILCS 207/25(c) (West 2006)). In addressing respondent's argument that

-12-

the State failed to timely disclose Dr. Leavitt's updated opinion, the court found that "[u]nlike Respondent's contention, the record shows that Dr. Leavitt did not testify to any new diagnosis, but merely testified that his diagnosis was current and therefore, there was no surprise on the part of Respondent." The court also found that respondent failed to show he was prejudiced because the court "gave respondent the opportunity to redepose Dr. Leavitt and to postpone the trial," which respondent declined. Finally, the circuit court found the State proved respondent a sexually violent person beyond a reasonable doubt. Specifically, the court found that the State met its burden of proof under the Act by presenting evidence that "[r]espondent had been convicted of a sexually violent offense, that he was diagnosed as suffering from a mental disorder, pedophilia, and that he is likely to commit future acts of sexual violence."

¶ 45    On November 9, 2009, the parties presented evidence in a dispositional hearing. Dr. Leavitt again testified on behalf of the State. The parties stipulated to Dr. Leavitt's qualifications in the field of clinical psychology and treatment of sex offenders. Dr. Leavitt testified that he has evaluated respondent five times, the most recent being in January of that year. His final evaluation was different than his previous evaluations because it was a predispositional investigation report where his primary focus was determining the least restrictive environment for respondent's treatment while also safeguarding the public. In addition to reviewing respondent's records, Dr. Leavitt interviewed respondent in November of 2008. During his testimony, Dr. Leavitt described respondent's prior convictions in similar fashion to his testimony in respondent's trial.

¶ 46    Dr. Leavitt testified respondent began treatment after his bench trial in 2006. He described respondent's progress as "exceedingly slow." Respondent had been in the "core sex offender groups and did participate in that particular specific component of the treatment for several months but then was removed from that as a result of a lack of treatment process." Respondent was in phase two, which was accepting responsibility, but did not make any progress. After removal from the "core sex offender" group, respondent was referred to a "tactics group," which respondent participated in and Dr. Leavitt believed he completed. Respondent was then referred to, and continued to participate at the time of the hearing in, the "power to change group." Dr. Leaving explained that the "power to change group *** is a specialized type of treatment modality designed to help individuals to look at and address the obstacles that keep them from making more adequate progress within the core sex offender specific treatment." It is designed to get an individual back into one of the core treatment programs. Dr. Leavitt testified that respondent is not back into the core treatment program because he continues to deny committing any of his prior convictions. Specifically, Dr. Leavitt stated that respondent has "difficulties and resistence to taking responsibility for and acknowledging his sexual crimes despite the fact that he did, in fact, plead guilty to three out of these four cases."

¶ 47    Dr. Leavitt opined that respondent "continues to suffer from both a diagnosis of pedophilia, sexually attracted to females, nonexclusive type and personality disorder not otherwise specified with narcissistic personality features." Based on a report by respondent's expert Dr. Kirk Witherspoon, Dr. Leavitt testified that respondent continues to masturbate to fantasies of female children age 10 to 14 approximately once per week. Dr. Leavitt opined

that respondent's mental disorder predisposes him to commit acts of sexual violence and affects his ability to control his actions.

¶ 48    In the course of his evaluation, Dr. Leavitt looked at three factors that would reduce respondent's risk of reoffending: age, health, and the impact of his sex offender treatment. Dr. Leavitt testified that although there is research that shows that individuals over the age of 60 have a reduced level of reoffending, "you have to look at the particular individual." He opined that despite respondent's age, "there was no evidence based on his particular course of behavior that there was any reduction, meaningful reduction, with respect to risk because of his age and the same thing would go with respect to his health consideration." Dr. Leavitt acknowledged that respondent has several health problems, including renal disease, kidney disease, vascular disease, and amputations, but noted that respondent "is in much better health over the last several years." He opined that despite respondent's health-related issues, "they have not had a marked impact on his primary dynamic risk factor and that is sexual relation problems."

¶ 49    Dr. Leavitt testified that despite respondent's admission of continued attraction to pre-adolescent children, respondent still claimed he was not at risk of reoffending. Dr. Leavitt opined that respondent continued to have a substantial probability of reoffending if released into the community. He testified further that in his opinion, respondent's treatment can proceed most effectively in a secure setting. He commented that he would not recommend a conditional release for respondent because he viewed respondent as "an untreated, chronic, fixated pedophile."

¶ 50    On cross-examination, Dr. Leavitt admitted that he was not aware of respondent's participation in a group called "problem solving." Dr. Leavitt also admitted there are treatments available for respondent that would allow respondent to participate without admitting his sex offense history. Dr. Leavitt did not take into consideration the recent research titled "Static 2002 R" because his approach in his most recent evaluation focused on what the least restrictive treatment was for respondent. When asked what "least restrictive" meant to him, Dr. Leavitt testified that it is "what type of setting can best meet [respondent's] needs and simultaneously safeguard the interests of the community."

¶ 51    Dr. Kirk Witherspoon, a licensed clinical psychologist, testified on respondent's behalf. After testifying about his qualifications, Dr. Witherspoon was allowed by the court to testify as an expert. In addition to reviewing respondent's record, Dr. Witherspoon interviewed respondent two times. Dr. Witherspoon testified that respondent "acknowledges an interest in prepubescent females as well as those I believe 16 and older." Dr. Witherspoon testified respondent was administered a sexual arousal test called "the penile platysmal graph." Dr. Witherspoon cautioned that the test is "not terribly reliable." Respondent did not exhibit sexual arousal from the stimuli administered as part of the test.

¶ 52    Dr. Witherspoon performed a risk assessment on respondent. He opined that "[b]ased on the structured risk assessment results and the actuarial results, [respondent] fell within a low–moderate risk categorical estimate." Dr. Witherspoon took respondent's physical condition into consideration to determine respondent's risk of reoffending. He believed respondent's health was a "strong mitigating factor," and that it would be "difficult for

[respondent] to act out and in deviant sexual ways."

¶ 53 Dr. Witherspoon also testified as to his opinion regarding respondent's treatment, stating "I think [respondent] would be better off in an outpatient setting, particularly one that would allow treatment where offense admission wasn't required. And given that that's the least restrictive environment for somebody with his demonstrated level of risk at this point."

¶ 54 On cross-examination, Dr. Witherspoon testified that respondent told him of his attraction to female girls age 12 to 14. Dr. Witherspoon also admitted respondent told him that once per week he masturbates to fantasies of 9- and 10-year-old females. He also acknowledged that respondent's excuse, when caught with sexual pictures of young females, that he was researching the media's exploitation of children "was not very believable." Respondent also denied having committed any sexual offenses, even the ones he pled guilty to, in speaking with Dr. Witherspoon. Dr. Witherspoon diagnosed respondent with pedophilia. When asked whether there was a controversy over the effect of age on reoffending, Dr. Witherspoon responded, "No. I think the controversy is gone."

¶ 55 On June 30, 2010, the circuit court found respondent's treatment should be in a secure facility. The court ordered that respondent be committed to DHS custody until further order of the court.

¶ 56 On July 22, 2010, respondent timely filed his notice of appeal. This appeal followed.

¶ 57 ANALYSIS

¶ 58 Respondent raises the following issues on appeal: (1) whether the circuit court erred in failing to dismiss the State's petition based on the alleged breach of a previous plea agreement or under collateral estoppel principles; (2) whether the circuit court erred in allowing the State to present evidence that respondent did not submit to an interview with a DHS psychologist or participate in any treatment in the DHS facility, where he was detained while awaiting trial; (3) whether the circuit court abused its discretion in denying respondent's motion for a new trial where the State allegedly failed to timely disclose an updated report from its expert; (4) whether the evidence was sufficient to prove that respondent is a sexually violent person; and (5) whether the circuit court abused its discretion when it committed respondent to institutional care in a secure facility rather than place him on conditional release. We will address each argument in turn.

¶ 59 Respondent first argues that the circuit court erred when it failed to dismiss the State's petition. Respondent asserts that the State breached a fully negotiated plea agreement that he entered into with the State in his final criminal conviction. As alternative support, respondent contends the State cannot relitigate two issues, his mental disorder that he had at the time of his criminal convictions or that he has a mental disorder that creates a substantial probability that he will reoffend based on collateral estoppel.

¶ 60 The State responds that respondent's March 1998 guilty plea to aggravated criminal sexual assault did not bar his subsequent civil commitment under the Act because the transcript of the proceedings contains no promise that the State would not seek respondent's civil commitment. The State asserts that there can be no breach of a plea agreement if there was no agreement. In response to respondent's collateral estoppel argument, the State argues

that respondent's argument fails because the Act is concerned with his current mental state, not his prior mental state.

¶ 61    Section 2-619 of the Code allows for involuntary dismissal of a claim by asserting " 'affirmative matter' outside of the pleading." *Czarobski v. Lata*, 227 Ill. 2d 364, 369 (2008) (quoting *Wallace v. Smyth*, 203 Ill. 2d 441, 447 (2002)). When proceeding under section 2-619 of the Code, the legal sufficiency of the complaint is admitted. *Doe A. v. Diocese of Dallas*, 234 Ill. 2d 393, 396 (2009). "When ruling on such a motion, the court must construe the pleadings and supporting documents in the light most favorable to the nonmoving party." *Lata*, 227 Ill. 2d at 369. Our standard of review of a section 2-619 motion is *de novo*. *Id.*

¶ 62    Respondent argues that the State's petition should have been dismissed for its alleged breach of a plea agreement between the parties. We note that respondent does not argue that the circuit court failed to admonish him of the consequences of his guilty plea; rather, he only argues that based on contract law principles, the State violated the plea agreement it entered into with him. Respondent attached to his section 2-619 motion to dismiss the transcript from his latest conviction, which includes testimony from the ASA, the court, and respondent. The State maintains that the transcript does not show any agreement between the parties whereby the State agreed that it would refrain from seeking to commit respondent under the Act. After reviewing respondent's motion, and attached transcript, we agree with the State. According to the transcript, the ASA explained the State's offer, stating "On a plea to Count One, the offer was seventeen years Illinois Department of Corrections." The ASA then stated "[a]s part of the plea agreement, the [S]tate will be dismissing the remaining counts. That is essentially the agreement." Defendant then pled guilty. Notably absent from the transcript is any mention of respondent's future civil commitment under the Act. The State cannot breach an agreement if the record shows that no agreement existed. *People v. Lumzy*, 191 Ill. 2d 182, 187 (2000).

¶ 63    Respondent's second contention why the circuit court should have dismissed the State's petition pursuant to section 2-619 of the Code is based on collateral estoppel. He urges the State cannot assert he had mental disorders for which he was previously convicted and that they create a substantial probability he will engage in acts of sexual violence.

¶ 64    The requirements of the doctrine of collateral estoppel are: "(1) the court rendered a final judgment in the prior case; (2) the party against whom estoppel is asserted was a party or in privity with a party in the prior case; and (3) the issue decided in the prior case is *identical* with the one presented in the instant case." (Emphasis added.) *People v. Tenner*, 206 Ill. 2d 381, 396 (2002).

¶ 65    Respondent's collateral estoppel argument fails because the issues in his prior convictions are not identical. At issue in his civil commitment under the Act is his current mental condition and his propensity for sexual violence at this time. This is different from his previous mental state for which he was charged with aggravated criminal sexual assault in 1997. Section 15 of the Act, which addresses the petition to commit a sexually violent person, states that "[t]he person is dangerous to others because the person's mental disorder creates a substantial probability that he or she will engage in acts of sexual violence" (725 ILCS 207/15(b)(5) (West 2000)); see also *In re Detention of Samuelson*, 189 Ill. 2d 548, 559

(2000) (In addressing whether the Act is subject to challenges based on double jeopardy or *ex post facto* principles, the supreme court stated, "[a] defendant cannot be involuntarily committed based on past conduct. Involuntary confinement is permissible only where the defendant presently suffers from a mental disorder and the disorder creates a substantial probability that he will engage in acts of sexual violence in the future."). Respondent's current mental condition and the probability that he will engage in future sexual violence are different issues than the issue of respondent's mental state, which led to his 1997 conviction for aggravated criminal sexual assault.

¶ 66    Accordingly, the circuit court did not err when it denied respondent's motion to dismiss the State's petition pursuant to section 2-619 of the Code.

¶ 67    Respondent's next argument is that the circuit court erred in allowing the State to present evidence that respondent did not submit to an interview with a DHS psychologist or participate in any treatment in the DHS facility he was detained in while awaiting trial. We hold respondent has waived this argument. Although respondent raised this issue in his posttrial motion, he did not object to the complained-of testimony at trial. See *Orzel v. Szewczyk*, 391 Ill. App. 3d 283, 287 (2009) ("Both an objection at trial and a written post-trial motion raising the issue are necessary to preserve an error for appellate review."). Respondent alleged in his opening brief that he objected at trial. However, his citation to the record did not show any objections at trial. Furthermore, our review of the record failed to uncover any objections to the complained-of evidence until respondent's posttrial motion. Accordingly, we hold respondent has waived this contention.

¶ 68    Respondent next argues that a new trial should be given because the circuit court did not bar Dr. Leavitt's 2006 update to his evaluation of respondent. Respondent alleges since the disclosure was untimely, it should have been barred from being introduced at trial. In response, the State argues that respondent elected to go forward with the trial despite the alleged discovery violation and rejected the court's suggestion to continue proceedings to allow for review of Dr. Leavitt's update or to further depose Dr. Leavitt. The State contends respondent invited any error.

¶ 69    In *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004), our supreme court explained the rule of invited error:

"Simply stated, a party cannot complain of error which that party induced the court to make *or to which that party consented*. The rationale behind this well-established rule is that it would be manifestly unfair to allow a party a second trial upon the basis of error which that party injected into the proceedings." (Emphasis added.) *Id.*

The court explained that such actions result in a procedural default. *Id.*

¶ 70    In the case at bar, the following colloquy between the court and respondent's counsel show that respondent consented to the court's actions.

"THE COURT: What I would suggest is this. I will allow Dr. Leavitt to be redeposed if you're willing on the basis of whatever information that you can gather and we can move from there if you want to do it that way. I want the deposition to take place in a prompt fashion.

Now *** do you want to do that, the element of surprise is taken out of it that way.

-17-

*** I want full information from everybody. And if that will be helpful to me if you wish to have a deposition of Dr. Leavitt taken or whatever else you want to do, I will open it up for that purpose because I will make the judicial statement that this case has been set several times.

RESPONDENT' S COUNSEL: Judge, I will go ahead and proceed today.

THE COURT: You want to proceed today?

RESPONDENT'S COUNSEL: I would just like the liberal opportunity on cross-examination with regards to his reliance on a new report.

***

THE COURT: Sure, or we can start today and I could enter and continue for you to look at it if you want.

RESPONDENT'S COUNSEL: If that becomes necessary, I will inform the court and request that.

THE COURT: Fine.

RESPONDENT'S COUNSEL: And I would like to proceed today."

The above exchange shows respondent consented to the circuit court's actions. It would be unfair to allow him to now complain of the course of action the circuit court took after he consented to it. Accordingly, respondent is procedurally defaulted from raising this issue before this court.

¶ 71    Respondent next argues the State failed to prove him guilty beyond a reasonable doubt. In response, the State contends respondent's argument is only an attack on the credibility of the State's expert witness and that respondent is asking the court to reweigh the evidence.

¶ 72    The Act defines a sexually violent person as "a person who has been convicted of a sexually violent offense *** and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence" (725 ILCS 207/5(f) (West 2006)). At trial, the State had "the burden of proving the allegations in the petition beyond a reasonable doubt" (725 ILCS 207/35(d)(1) (West 2006)). In reviewing the sufficiency of the evidence, "we ask only whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could find the elements proved beyond a reasonable doubt." *In re Detention of Erbe*, 344 Ill. App. 3d 350, 373 (2003). We will not reweigh the evidence because it is the function of the trier of fact to decide what reasonable inferences to draw from the evidence, to evaluate whether witnesses are credible, and to resolve any conflicts in the evidence. *Id.*

¶ 73    In this case, the State alleged in its petition that respondent was convicted of and sentenced on four sexually violent offenses; that he was diagnosed with two mental disorders, and that "[a]s a result of the Respondent's sexual offense history and his mental health diagnosis, which indicate that he suffers from a mental disorder, it is substantially probable that Respondent will engage in future acts of sexual violence." The State presented certified copies of respondent's convictions and Dr. Leavitt testified regarding his diagnosis of respondent having the mental disorders of pedophilia, primarily attracted to females, nonexclusive type; and secondary personality disorder, not otherwise specified with

-18-

narcissistic personality features. The State offered, through the testimony of Dr. Leavitt, detailed testimony explaining why it is substantially probable that respondent will engage in future acts of sexual violence, despite respondent's age and health. Respondent's expert witness, Dr. Davis, disagreed with Dr. Leavitt's opinion. However, it is not the function of this court to reweigh the evidence, make credibility determinations, or resolve conflicting evidence. *In re Erbe*, 344 Ill. App. 3d at 373. We hold the State presented sufficient evidence proving the allegations of its petition beyond a reasonable doubt.

¶ 74        Respondent's final argument is that the circuit court abused its discretion when it committed respondent to institutional care in a secure facility rather than place him on conditional release after his dispositional hearing. The State responds that the circuit court did not abuse its discretion. The State argues that respondent's history of reoffending, his mental disorder, and his current mental condition demonstrate his need for treatment in a secure facility.

¶ 75        After a person is found to be a sexually violent person, the Act provides that an order of commitment shall be entered ordering the person to be committed in either institutional care in a secure facility or be placed on conditional release (725 ILCS 207/40(b)(2) (West 2010)). Section 40(b)(2) of the Act provides:

> "In determining whether commitment shall be for institutional care in a secure facility or for conditional release, the court shall consider the nature and circumstances of the behavior that was the basis of the allegation in the petition ***, the person's mental history and present mental condition, and what arrangements are available to ensure that the person has access to and will participate in necessary treatment. *** The Department shall arrange for control, care and treatment of the person in the least restrictive manner consistent with the requirements of the person and in accordance with the court's commitment order." 725 ILCS 207/40(b)(2) (West 2010).

We review the circuit court's decision to commit a person to a secure facility or to conditional release for an abuse of discretion. *In re Erbe*, 344 Ill. App. 3d at 374. The circuit court's ruling will only be considered an abuse of discretion if that decision is unreasonable, arbitrary or where no reasonable person would take the same view as the circuit court. *Id.*

¶ 76        At the dispositional hearing, the State presented the detailed testimony of Dr. Leavitt. He testified that respondent was not making progress in his treatment and was not taking responsibility for his offenses. He found respondent continued to suffer from pedophilia, sexually attracted to females, nonexclusive type, and personality disorder not otherwise specified with narcissistic personality features. He opined that respondent's mental disorders predisposed him to commit acts of sexual violence and affected his ability to control his actions. He testified respondent continued to fantasize about female children age 10 to 14 approximately once per week. Even considering respondent's age and health problems, Dr. Leavitt did not recommend conditional release because he believed respondent is "an untreated, chronic, fixated pedophile." We cannot say the circuit court's decision to commit respondent to a secure facility is unreasonable or arbitrary. Respondent's expert witness, Dr. Witherspoon, disagreed with Dr. Leavitt's opinion that treatment in a secure facility was the best course of treatment for respondent. However, it is not the function of this court to

reweigh the evidence, make credibility determinations, or resolve conflicting evidence. *In re Erbe*, 344 Ill. App. 3d at 373. Accordingly, we hold the circuit court did not abuse its discretion when it committed respondent to a secure facility for treatment as opposed to conditional release.

¶ 77                                            CONCLUSION

¶ 78        The judgment of the circuit court of Cook County is affirmed.

¶ 79        Affirmed.