# Illinois Official Reports

## Appellate Court

---

*In re Commitment of Tunget*, 2018 IL App (1st) 162555

---

| | |
|---|---|
| Appellate Court Caption | *In re* COMMITMENT OF STEVEN TUNGET (The People of the State of Illinois, Petitioner-Appellee, v. Steven Tunget, Respondent-Appellant). |
| District & No. | First District, Fifth Division<br>Docket No. 1-16-2555 |
| Filed<br>Modified upon denial<br>of rehearing | June 29, 2018<br><br>August 24, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 04-CR-80005; the Hon. Dennis J. Porter, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Law Offices of Chicago-Kent College of Law, of Chicago (Daniel T. Coyne, Matthew M. Daniels, Michael R. Johnson, and Kate E. Levine, of counsel), for appellant.<br><br>Lisa Madigan, Attorney General, of Chicago (David L. Franklin, Solicitor General, and Michael M. Glick and Joshua M. Schneider, Assistant Attorneys General, of counsel), for the People. |

Panel                    JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Presiding Justice Reyes and Justice Hall concurred in the judgment and opinion.


# OPINION

¶ 1     Respondent, Steven Tunget, was adjudicated a sexually violent person (SVP) as defined by the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2008)) and subsequently institutionalized in a secure setting. The trial court later conditionally released respondent; however, the conditional release was revoked on the State's petition. On appeal, respondent contends that the trial court erred in revoking his conditional release and recommitting him to institutional care. Respondent additionally claims that the trial court abused its discretion in allowing expert testimony that relied upon a nonstatutory standard. Based on the following, we affirm.

¶ 2                                    FACTS
¶ 3     Respondent, who is 61 years old, was diagnosed with paraphilia, not otherwise specified; voyeurism; exhibitionism; and antisocial personality disorder. He was detained under the Act in 2004 after a finding that it was substantially probable that he would engage in acts of sexual violence. Thereafter, while institutionalized in a secure setting, respondent participated in the Illinois Department of Human Services' (DHS) sex offender treatment program.

¶ 4     On October 6, 2010, respondent filed a petition for conditional release. At the hearing on respondent's petition, Dr. Kimberly Weitl, a DHS evaluator, and Dr. Lesley Kane, an examiner appointed by the court, recommended respondent's conditional release. The trial court granted respondent's petition. DHS then prepared a conditional release plan requiring respondent to agree to abide by the 52 listed conditions of release. On August 20, 2012, the trial court approved the conditional release plan, which respondent agreed to by signing and initialing the plan next to each condition. In relevant part, the conditional release plan required that respondent (1) refrain from having any contact with other sex offenders outside the treatment setting without prior approval (Condition 16), (2) refrain from having any contact with a minor child without prior approval (Condition 17), (3) "provide a daily log of activities and monthly written reports as directed by the DHS case management team" (Condition 27), (4) comply with all conditions imposed by the conditional release agent and DHS case management team to restrict high-risk situations and access to potential victims (Condition 28), and (5) refrain from having anyone in his apartment without prior approval (Condition 50).

¶ 5     Respondent remained on conditional release until the State filed a petition to revoke that status. The petition was filed on July 15, 2015, and respondent was detained in a secure facility pending a hearing. On August 24, 2015, the State filed an amended petition to revoke respondent's conditional release, alleging he violated six conditions of his conditional release plan, namely, Conditions 11 (become self supporting and gainfully employed), 16, 17, 27, 28, and 50. The State's petition additionally alleged respondent's conditional release should be revoked to protect the safety of others. More specifically, the State alleged respondent

(1) engaged in inappropriate conversations with women in the community and misinterpreted the women's intentions as sexual advancements, (2) failed to make sufficient progress in treatment, (3) frequently and intently watched his neighbors, and (4) consistently failed to be honest with his case management team. Prior to the hearing, respondent moved to strike the allegation that he violated Condition 11 where the State failed to present a sufficient claim to support revocation of his conditional release on that basis. The trial court granted respondent's motion.

¶ 6 The State presented three witnesses at the revocation hearing: Stephen Glazier, respondent's conditional release agent; Rhonda Meacham, respondent's conditional release treatment provider; and Dr. Weitl, who had been conducting periodic reexaminations of respondent for eight years. Prior to the hearing, respondent attempted to bar Dr. Weitl's testimony, arguing she had no relevant admissible opinion because her opinion differed from the statutory standard for conditional release and she inappropriately destroyed the notes she took during her consultation with Meacham and interview with respondent. Respondent's motion to bar Dr. Weitl from testifying was denied.

¶ 7 At the hearing, Glazier testified that, as respondent's conditional release agent, he monitored and supervised respondent while on conditional release through home contact visits and surveillance. Glazier used a written log to memorialize his contacts with respondent and wrote violation reports when respondent violated a condition of his release. Glazier stated that respondent was assigned an apartment by DHS and was limited to home confinement, like all SVPs, when first released.

¶ 8 Glazier testified that he completed a violation report on September 4, 2013, as a result of respondent violating Condition 17 of his release plan. More specifically, Condition 17 prohibited respondent from having any contact with a minor without prior approval, yet respondent sent a homemade birthday card to the daughter of his former girlfriend, Takika Winston. Prior to respondent's conditional release, he was explicitly told that he could not have any contact with Takika's daughter. Takika's daughter was believed to be 16 years old when respondent sent her the birthday card. Respondent told Glazier that he placed the card in the mailbox as he exited his apartment to meet Glazier. Respondent acknowledged that he was "not supposed" to mail the card.

¶ 9 Glazier additionally testified that, on October 20, 2014, he completed another violation report, resulting from three condition violations. The first was for a violation of Condition 16, *i.e.*, unauthorized contact outside of the treatment setting with a sex offender. Glazier explained that, while conducting an unannounced home visit, he was standing outside respondent's apartment when he heard respondent's voice engaged in a conversation. Glazier knocked on the apartment door, but respondent failed to answer. Glazier proceeded to call respondent two times without success. Glazier continued knocking on the apartment door until respondent eventually opened the door. After looking through respondent's apartment and failing to find any occupants, Glazier inquired whether respondent had been on the phone. Respondent said no. Respondent acknowledged that he had been speaking through the window to another SVP named Troy K. in the adjacent building. Respondent initially reported that he spoke to Troy K. a few times; however, after further questioning, respondent admitted that he had been speaking to Troy K. twice a day for a few months. According to respondent, he and Troy K. engaged in "general conversation." They did not plan anything illegal or commit any sex offenses. Glazier testified that respondent previously requested authorization through the

program to speak to Troy K., but was denied approval to do so. Respondent acknowledged he was not supposed to speak to Troy K. outside the treatment setting, yet he did anyway. Glazier stated that he was responsible for transporting respondent and Troy K. to treatment because they were on restricted movement or home confinement. Glazier drove them together to treatment, as well as to the grocery store and laundromat.

¶ 10    Glazier testified that the second violation included in the October 20, 2014, report was for respondent's violation of Condition 27 because he failed to include his communications with Troy K. in his daily log of activity. Glazier described the daily event log as a log kept by the individual on conditional release providing the details of his or her daily activities, including finances, communications (in person and by telephone), reading habits, and television programs watched. The daily logs were collected and reviewed on a weekly or bi-weekly basis. Glazier explained that the purpose of the daily logs was transparency by the SVP with the conditional release team. According to Glazier, respondent only logged two dates, October 10, 2014, and October 15, 2014, for having communicated with Troy K.

¶ 11    According to Glazier, the third conditional release violation included in the October 20, 2014, violation report was for Condition 28, which required respondent to comply with all special conditions imposed by the conditional release agent and DHS management team to restrict him from high-risk situations and access to potential victims. Respondent violated the condition by communicating with Troy K., despite Glazier's prior instruction to not have outside contact with the fellow SVP. As a result of the conditional release violations, respondent's windows were covered on the side of the apartment adjacent to Troy K.'s building. Thereafter, in January 2015, respondent was relocated to another apartment.

¶ 12    Glazier further testified that, on April 25, 2015, he wrote a letter of admonishment resulting from a phone message he received from respondent. In the message, respondent informed Glazier that he was in his kitchen with the door open to get fresh air, which had been approved, when a neighbor knocked on his door. The female neighbor asked if she could walk through respondent's apartment to get to her front door because she was locked out. In the letter of admonishment, Glazier cited Condition 50 because respondent did not have prior authorization to have anyone in his apartment. Glazier added that respondent called him several times after leaving the initial voicemail. Respondent did not attempt to touch the neighbor. Glazier explained that respondent received a letter of admonishment and not a violation because he immediately reported the interaction.

¶ 13    Meacham testified that she was a licensed clinical social worker and sex offender treatment provider and evaluator. Meacham provided respondent's individual and group therapy while he was on conditional release. Meacham was deemed an expert in sex offender treatment.

¶ 14    Meacham testified that respondent admitted violating a condition of his release in September 2013 by contacting Takika's minor daughter. Respondent reported that he sent the minor Christmas and birthday cards, as well as a letter. According to Meacham, she had "many conversations" (between 5 and 10) in which respondent was told that he could not contact Takika's daughter.

¶ 15    Meacham also discussed events that occurred in June, July, and August 2014. The first interaction involved a woman who allegedly invited respondent to be her roommate. The second interaction involved a woman that respondent had contact with in connection with his medical transportation services. Respondent reported to Meacham that he rode in the front seat of the vehicle while being transported. The female driver purchased ice cream for respondent

and put her hand on respondent's leg while they shared conversations about their families. Respondent also shared information regarding his participation in the program with the driver. According to Meacham, respondent withheld reporting the incident for a "period of time" and did not include the interactions in his daily logs. Meacham testified that the boundaries between respondent and the female driver were inappropriate. Later, respondent further informed Meacham that, during another transport with the same female driver, she disclosed that she was a victim of sexual abuse. Respondent then shared his own history of victimization with the driver. After that interaction, respondent requested that he only receive male medical transport drivers. Despite his request, the next time he needed to be transported, the same female driver arrived. Respondent told Meacham that the pair continued having personal conversations during the transport. The third interaction involved a woman at Target. Respondent told Meacham that he would become excited when he knew that he was going to Target, hoping he would "run into" the woman. Meacham testified that respondent's behaviors were concerning because he lacked the ability to establish boundaries regardless of the consequences. Meacham added that she was concerned with respondent's decision to withhold information from his care providers.

¶ 16     Meacham further testified that respondent engaged in concerning behavior in September 2014. At that time, respondent reported his observations of other individuals in his apartment complex to the building management. Respondent "seemed to have a great deal of information about some of the tenants in the building." This was concerning in light of respondent's voyeurism and exhibitionism diagnoses, as well as in terms of respondent's own safety because he was witnessing alleged criminal behavior within the building. In fact, in October 2014, respondent reported witnessing a drug transaction through his window. He called the police and "watched everything unfold."

¶ 17     Meacham added that, also in October 2014, she learned respondent had been communicating with another client in the conditional release program who was housed in the adjacent building. The pair had been communicating once or twice per day for a "couple of months" through the window. Meacham testified that the communications were violations of respondent's conditional release. According to Meacham, the pair had general conversations about their day and what they watched on television; however, they had a couple of "fairly negative conversations about their conditional release agents."

¶ 18     Respondent additionally reported to Meacham that, in October 2014, he had an interaction with a nurse at a doctor's appointment. Respondent believed the nurse "gave him a lingering handshake." According to Meacham, respondent interpreted the handshake as an "attraction." He responded by telling the nurse she was attractive.

¶ 19     Meacham further testified that, in December 2014, respondent reported that he walked through his apartment naked after showering and passed two pictures of former girlfriends while doing so. When he walked by the pictures, respondent asked "what they were looking at." Respondent stated that he masturbated to fantasies of the interactions. Meacham testified that respondent did not include the sexual activity in his sexuality logs, which she required respondent to keep. Meacham clarified that the sexuality logs were not a separate condition in his conditional release plan but, rather, were part of the condition that required him to fully participate in treatment.

¶ 20     Also, in December 2014, respondent had an interaction after undergoing hernia surgery. When he woke from the surgery, he discovered his genital area had been shaved and reported

wondering "whether or not the nurse who shaved him had liked what she saw." Respondent additionally reported that, when asked by a hospital nurse if she could view his surgical stitches, he fantasized that she was asking to see his penis. Respondent also lifted his clothes to reveal his stitches to group members and the conditional release agents. Meacham testified that respondent asked if she wanted to see respondent's stitches. Meacham believed respondent's behaviors served to reinforce his interest in exhibitionism.

¶ 21    Meacham opined that respondent was in his "offending cycle," meaning "a progressive build up in thought and behavior and emotion typically that if not intervened on it could result in reoffense." Meacham did not believe respondent was aware he was in his offending cycle. Meacham discontinued her work with respondent in May 2015 due to other responsibilities. As a result, respondent was transitioned to a different therapist. His group therapy sessions no longer consisted of only SVPs, but also included individuals on probation and parole. Meacham described respondent's progress in the program as "variable." Meacham explained that, initially when he was released, there was a period of stability and progress; however, around June 2014, respondent started to decline. Meacham observed no progress from that time until May 2015. Meacham also described a shift in respondent's willingness to share information close in time to when a given event occurred.

¶ 22    On cross-examination, Meacham described respondent as "a verbally active participant" in group therapy. Meacham testified that she was unaware of the content of the cards respondent sent to Takika's minor daughter. Meacham stated there was no evidence he sent unauthorized mail to a minor after that incident. Meacham additionally testified that there was no indication respondent touched or made inappropriate comments to the female medical transport driver, nor was there any evidence respondent attacked, touched, flashed, or made sexual comments to the female Target employee. Meacham stated there was no indication that respondent became sexually aroused by watching his neighbors.

¶ 23    Dr. Weitl testified next. Dr. Weitl was qualified as an expert in clinical psychology in the evaluation and risk analysis of sex offenders. Dr. Weitl testified that she reevaluated respondent on an annual basis as required by the Act. In her initial evaluation in 2008, Dr. Weitl learned respondent's sexually violent history. The first incident of record was in 1977 wherein respondent committed a sexual offense against a 15-year-old girl that was babysitting respondent's brother. Respondent was 20 years old at the time. In 1981, respondent was convicted of public indecency after he was found peeping over a bathroom stall at a 10-year-old girl and an 11-year-old girl while he had his pants down. In 1982, respondent was convicted of attempted rape by force involving a 14- or 15-year-old girl. In 1984, respondent was convicted of aggravated battery wherein he broke into a woman's home, dragged her to the bathroom, forced her to undress, banged her head on the floor or sink, commanded her to get into the bathtub, and then he fled. In 1986, respondent was found to be a sexually dangerous person after 14 charges were filed against him, including placing obscene phone calls, exposing himself to minors, exposing himself outside of a store, and masturbating in a parking lot. Dr. Weitl testified that respondent was discharged from the sexually dangerous persons program in 2003. However, approximately three months later, respondent was convicted of criminal sexual abuse in relation to groping an 11-year-old girl's buttocks while in a grocery store. Respondent attempted to pay off the child's father to not report the incident and attempted to flee. While in prison following his conviction, respondent exposed himself to female correctional officers.

¶ 24    Dr. Weitl testified that she recommended respondent for conditional release in August 2012. According to Dr. Weitl, respondent "appeared from [her] treatment notes and from [her] interview with him to have gained benefit from treatment. He had a long pattern of treatment before that. He was in the final phases of treatment at the facility. So [she] recommended him for release."

¶ 25    Dr. Weitl stated, however, that she wrote a report in June 2015 upon which the State based its underlying petition to revoke respondent's conditional release. Prior to writing the report, Dr. Weitl conducted her annual reevaluation, which consisted of reviewing the records from the case management team, the therapist's notes, completed assessments, polygraphs, and penile plethysmograph examinations, which measure sexual arousal, and conducting interviews with Meacham and respondent. Dr. Weitl testified that, as a result of her reevaluation, she recommended that respondent required "more supervision and more intense therapy than could be provided in the community and that he be returned to the facility." Specifically, in her June 2015 report, Dr. Weitl opined that respondent's "progress in treatment [wa]s insufficient for him to continue to be safely managed and treated in the community on Conditional Release and he should be returned to the DHS [facility] for secure care and intense sex offender specific treatment." Dr. Weitl explained at trial that respondent was "engaging in high risk behaviors, in his cycle and not recognizing it, and ready to reoffend. [Respondent] was not being honest. There were some serious concerns about what exactly he was doing. There had been some polygraph failures and then he would tell a little bit. So there were some serious indicators that [respondent] was not safe out there." Dr. Weitl added that respondent was not following the conditions of his release and disclosed only limited details of his violations after failing multiple polygraph tests. Moreover, after returning to the secure facility, respondent still did not admit the extent of his conditional release violations. Dr. Weitl opined that respondent continued to be an SVP and "that he's substantially probable to commit another act of sexual violence if not confined to a secure facility."

¶ 26    Dr. Weitl continued by stating that, since having completed the June 2015 report, she had reviewed respondent's DHS reports through February 2016. Based on what she had learned, Dr. Weitl did not change her opinion from that rendered in the June 2015 report. Dr. Weitl elaborated that, in that time period, respondent had not addressed his sexual deviance and provided "extremely vague" disclosures in his group therapy. Dr. Weitl acknowledged that respondent had not had any "tickets for sexual misconduct" since he had been back in the secured setting. Dr. Weitl additionally acknowledged a therapist's monthly progress note from October 13, 2015, which provided that respondent had "processed the violations and warnings that ultimately led to his return from conditional release." Dr. Weitl, however, dismissed the therapist's note as "a summary" that had been "over-generaliz[ed]." Dr. Weitl also acknowledged that respondent passed his most recent polygraph exam administered in July 2015.

¶ 27    At the close of the hearing, respondent moved for a directed finding. The motion was granted as to the allegation related to sending a card to Takika's minor daughter. The remainder of the motion was denied. Respondent then moved to strike Dr. Weitl's testimony, arguing the State failed to disclose her opinion in its Illinois Supreme Court Rule 213 (eff. Jan. 1, 2007) interrogatory response. The trial court denied respondent's motion without providing a basis for its ruling.

¶ 28　　　On April 11, 2016, the trial court found respondent had violated conditions of his release and, therefore, his conditional release should be revoked. In so finding, the court stated:

"The statute requires that at this hearing that the defendant's conditional release may be revoked, *** it's discretionary. After hearing that any rule or *** condition of release has been violated, or that the safety of others requires a conditional release be revoked. ***

So [I] think the statute requires some *** imminent danger to somebody ***. At least that's the way I'm going to take this. I don't think the State has shown that, some imminent danger to a specific person.

On the other side, that is that any rule or condition of release has been violated, *** I don't see there being any issue, there have been several which have been violated. With regard to the woman in the apartment building, I *** cannot see revoking anyone's conditional release on that set of facts, particularly where he calls the case agent while she's in the apartment. I mean there's got to be some consideration for a little human decency here, I suppose.

Looking out the window, same thing. I mean what else has he got to do, watch television, I suppose. There's no evidence that he was indulging in his voyeurism out the window, at least I'll give him the benefit of the doubt on that.

With the polygraph, same thing. Sitting here now, I can't conceive—I suppose if you gave me some time I can conceive of some situation where I would revoke it on the basis of a response to a polygraph, I suppose, but this isn't it, that's for sure, so—especially if he's a liar about how he was feeling about the polygraph, he's a pretty good one ***. ***

Now, [d]efense has said that, you know, everything's in treatment, which quite frankly seems a wee bit of a stretch to me. ***

*** I don't think it's true for the defendant about being in treatment while he's riding in a cab or sitting in the doctor's office waiting to go in or talking out his window with someone else who is sexually violent.

Again, your argument about how he didn't act [out] about any of these, I think the State is correct, the whole purpose of this is to prevent him from acting out. It would be pitifully redundant to say he's got to be acting out before you can do it because then you might as well just prosecute him for the new crime and be done with it.

So there we have it. Of the violations—I think there is evidence both borne by his statements and the fact that he admitted these things, albeit somewhat reluctantly, according to the testimony his contact log including the deficiencies in the masturbation and talking to the *** other person who was adjudicated sexually violent through his window for an extended period of time, these things are violations, and the State has shown that by clear and convincing evidence.

Now, the question then becomes are these actions sufficient to revoke the defendant's conditional release? Every witness who testified, the case agent, his treatment provider, as well as Dr. Weitl has expressed concern that [respondent] is in his cycle for re-offending at various times and not recognizing it. And this is—they have all expressed a concern for it, and I do not feel that this Court is in a position to ignore the testimony regarding this concern for the reason that I alluded to further. It's

not that he's done something, it's the fact that they are concerned that he is going to do something because he doesn't recognize he's in this cycle.

I must confess when I first heard the testimony regarding him masturbating improperly, I was a little bewildered, but having had it explained to me, I can see where that type of masturbation would be—they would be concerned about it, because there is an element of exhibitionism with it, particularly if he's pretending like the two picked females, their pictures are watching him, and that is one of his diagnoses, that is one of his problems, and I can see where they would be concerned about that.

So in view of the fact that all the witnesses expressed this concern, I feel it is necessary that [respondent's] conditional release be revoked and that he be remanded to the Treatment Detention Facility.

That's not to say, [respondent], I don't want to leave you with the belief there is no hope. The fact that I think you probably made some progress or at least potentially made some progress since you were back, and I would not be surprised to find that they were recommending you for conditional release at some time in the future, and that's not to say that I would not be disposed to grant it based upon appropriate testimony."

¶ 29 Thereafter, respondent filed a motion to reconsider the trial court's April 11, 2016, order. After hearing arguments by the parties, the trial court denied respondent's motion. This appeal followed.

¶ 30                                                    ANALYSIS

¶ 31 The Act defines an SVP as a person who has been convicted of a sexually violent offense and who is dangerous because he "suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2004). The State has the burden of establishing beyond a reasonable doubt that an individual is an SVP; "once the State does so, the respondent is committed to the custody of DHS for control, care, and treatment 'until such time as the person is no longer a sexually violent person,' which could hypothetically only end upon death." *In re Commitment of Rendon*, 2014 IL App (1st) 123090, ¶ 21 (quoting 725 ILCS 207/35, 40(a) (West 2010)). After an individual is found to be an SVP and is institutionalized in a secure setting to receive treatment for his or her mental disorders, he or she is "reexamined" on a yearly basis to determine whether he or she qualifies for conditional release. 725 ILCS 207/50, 55 (West 2004). More specifically, the relevant statute provides that the respondent is reevaluated "for the purpose of determining whether the person has made sufficient progress to be conditionally released or discharged." *Id.* § 55(a). In 2012, the statute was amended to state that a respondent is reevaluated "for the purpose of determining whether: (1) the person has made sufficient progress in treatment to be conditionally released and (2) whether the person's condition has so changed since the most recent periodic reexamination *** that he or she is no longer a sexually violent person." Pub. Act 97-1075 (eff. Aug. 24, 2012).

¶ 32 If an individual is granted conditional release, the SVP remains within the custody and control of the DHS and is subject to the conditions set by the court and the DHS. 725 ILCS 207/40(b)(4), (b)(5) (West 2012). These conditions require a respondent to attend and fully participate in assessment, treatment, and behavior monitoring, including, but not limited to, medical, psychological, or psychiatric treatment specific to sex offending to the extent appropriate and based on DHS recommendations. *Id.* § 40(b)(5)(F); *Rendon*, 2014 IL App

(1st) 123090, ¶ 25. Moreover, while on conditional release, a respondent must comply with "all other special conditions that the [DHS] may impose," restricting him or her from "high-risk situations" and limiting "access or potential victims." 725 ILCS 207/40(b)(5)(BB) (West 2012).

¶ 33    If there is an allegation by the DHS "that a released person has violated any condition or rule, or that the safety of others requires that conditional release be revoked, he or she may be taken into custody under the rules of the [DHS]." *Id.* § 40(b)(4). In the proceedings following the filing of a petition to revoke a respondent's conditional release, the State must prove by clear and convincing evidence that revocation of conditional release is required. *Id.*

¶ 34    As an initial matter, the parties dispute the applicable standard of review. Respondent contends a trial court's ruling on a petition to revoke conditional release should not be disturbed unless it is against the manifest weight of the evidence. Respondent cites *Rendon*, 2014 IL App (1st) 123090, ¶ 32, for support. In contrast, the State contends there is a two-part standard of review. The State agrees with respondent insomuch as the trial court's factual findings regarding whether the respondent violated the conditions of his release is a decision that should not be overturned unless it is against the manifest weight of the evidence. However, the State argues the trial court's finding as to whether, given the violation, the respondent's conditional release should be revoked requires an exercise of the court's discretion and should not be overturned absent an abuse of that discretion. The State cites *Rendon* and section 40(b)(4) of the Act as support.

¶ 35    We agree with the State that our review of whether the trial court erred in finding respondent violated the conditions of his release and whether his conditional release should be revoked as a result requires a two-step analysis. The trial court's factual finding that the State presented clear and convincing evidence to establish respondent violated the conditions of his release will not be disturbed unless the finding was against the manifest weight of the evidence. *Id.* A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or the trial court's conclusion is "unreasonable, arbitrary, and not based upon the evidence presented." *In re Commitment of Trulock*, 2012 IL App (3d) 110550, ¶ 43. However, once a basis for revocation of conditional release has been established, whether to commit a person to a secure facility or to continue conditional release is a matter within the discretion of the trial court. The Act provides "[i]f the court determines *** that any rule or condition of release has been violated, *** it *may* revoke the order for conditional release and order that the released person be placed in an appropriate institution." (Emphasis added.) 725 ILCS 207/40(b)(4) (West 2012). The permissive language employed by the statute refers to a discretionary power, which the court may exercise or not as it chooses. *People v. Ousley*, 235 Ill. 2d 299, 313 (2009) (citing *People v. Robinson*, 217 Ill. 2d 43, 51 (2005)). A trial court's decision following an exercise of its discretion will not be overturned absent an abuse of that discretion. *In re Detention of Ehrlich*, 2012 IL App (1st) 102300, ¶ 75 ("[w]e review the circuit court's decision to commit a person to a secure facility or to conditional release for an abuse of discretion"); *In re Detention of Lieberman*, 379 Ill. App. 3d 585, 608-09 (2007) (applying an abuse of discretion analysis to assess a trial court's decision to commit the respondent to a secure facility). An abuse of discretion will be found only if the trial court's decision was unreasonable, arbitrary, or no reasonable person would adopt the same view. *In re Detention of Ehrlich*, 2012 IL App (1st) 102300, ¶ 75.

¶ 36    Respondent contends that the trial court's ruling was against the manifest weight of the evidence where the conditions the court deemed had been violated were not current, where the court's finding that respondent was in his "cycle" was not supported by the record, and where the record demonstrated he had shown signs of improvement at the time of the hearing. With regard to the condition violations, respondent argues that his contact with Troy K., the other SVP, occurred nine months before the State filed its original petition seeking to revoke his conditional release. As a result, the condition violation was not current. In addition, respondent argues that his conversations with Troy K. were of no concern where they lacked objectionable substance. Respondent further argues that his masturbating fantasies in connection with the photographs of his former girlfriends and his failure to memorialize the incidents in his sexuality log did not provide a basis for revocation of his conditional release. According to respondent, the masturbating incidents were not current violations where they took place seven months before the filing of the State's original petition to revoke his conditional release. Moreover, respondent argues that his conditional release plan did not contain a condition requiring him to participate in sexuality logs.

¶ 37    We find the trial court's determination that there was clear and convincing evidence respondent violated the conditions of his release was not against the manifest weight of the evidence. Respondent does not dispute that he spoke to Troy K. in violation of Condition 16 of his conditional release plan. Respondent merely disputes the magnitude of the violation in light of the time that passed, since the violation was committed and the lack of dangerous content in the conversations. The Act, however, does not contain a time element establishing how long a violation remains eligible to support revocation of conditional release. See 725 ILCS 207/40(b)(4) (West 2012). Moreover, respondent's conditional release plan did not provide an exception for conversing with fellow SVPs if the content of the conversations was "innocuous." Instead, Condition 16 merely stated that respondent could not have contact with any SVP outside of a therapeutic setting without prior consent. There is no dispute that respondent spoke to Troy K. twice per day for "a couple of months" outside the therapeutic setting, namely, through the windows of their adjacent apartment buildings. Additionally, the record is clear that respondent did not have authorization to converse with Troy K. in that setting. In fact, Glazier testified that he expressly denied respondent's request to speak to other SVPs. Furthermore, the evidence was clear that respondent failed to log his conversations with Troy K. in his daily log in violation of Condition 27 of his release. According to Glazier, respondent merely logged two of the conversations at issue.

¶ 38    The State also established by clear and convincing evidence that respondent violated Condition 28 of his release by failing to log the masturbating episodes he engaged in while viewing pictures of his former girlfriends. The State acknowledges that respondent's conditional release plan did not include an express condition requiring him to maintain a sexuality log. Meacham, however, testified that the sexuality log was a condition she required as his therapist. As a result, respondent's failure to submit the masturbation episodes in his sexuality log was a violation of Condition 28, which required respondent to comply with all conditions imposed by his conditional release agent and DHS case management team to restrict high-risk situations and access to potential victims.

¶ 39    Where the State provided clear and convincing evidence that respondent violated his conditional release plan, the State was not also required to prove that "the safety of others" required revocation of his conditional release. Contrary to respondent's argument, the trial

court determined that respondent violated the conditions of his release and then exercised its discretion in considering whether the condition violations required that his conditional release be revoked. The language of the statute is clear that "[i]f the [DHS] alleges that a released person has violated any condition or rule, *or* that the safety of others requires that conditional release be revoked, he *** may be taken into custody under the rules of the [DHS]." (Emphasis added.) 725 ILCS 207/40(b)(4) (West 2012). Accordingly, a respondent's conditional release may be revoked either if (1) there is a violation of a condition or (2) the safety of others requires revocation. Because we have found the trial court did not commit manifest error in determining respondent violated his conditional release plan, we need not undergo an assessment of whether the evidence was sufficient to establish respondent was a danger to the safety of others.

¶ 40   We next turn to the second part of the analysis, namely, whether the trial court abused its discretion in finding that respondent's conditional release should be revoked. As stated, the Act provides that "[i]f the court determines after hearing that any rule or condition of release has been violated, *** it may revoke the order for conditional release and order that the released person be placed in an appropriate institution until the person is discharged from the commitment under *** this Act or until again placed on conditional release under *** this Act." *Id.* The Act is silent on the factors to consider in recommitting an individual following the revocation of his or her conditional release and we have not found any cases on point. See 725 ILCS 207/1 *et seq.* (West 2012). However, in considering whether an individual shall be committed to an institutionalized setting or granted conditional release, the relevant factors provided by the Act are "the nature and circumstances of the behavior that was the basis of the allegation in the petition ***, the person's mental history and present mental condition, and what arrangements are available to ensure the person has access to and will participate in necessary treatment." *Id.* §§ 40(b)(2), 60(d). Without additional, explicit guidance from the Act, we find these factors to be relevant in assessing whether the trial court abused its discretion.

¶ 41   It is clear from the record that the trial court considered all of the evidence and that its determination was well supported. Glazier and Meacham discussed the pattern of respondent's behavior constituting violations of his conditional release. Critically, Glazier, Meacham, and Dr. Weitl expressed concern over respondent's consistent failure to report his offending behaviors in his logs, on his polygraphs, and in his individual and group therapy sessions. The record demonstrated that, generally, respondent reluctantly and vaguely reported the behaviors only after he failed polygraph tests. In assessing the circumstances of the behaviors underlying the State's allegations, the trial court did consider that a number of the behaviors did not support findings of condition violations. The trial court additionally considered evidence demonstrating that respondent had made some progress since his readmission into the DHS facility. The court, however, relied on the expert opinions of Meacham and Dr. Weitl in providing that respondent was in a cycle of reoffense without recognizing his repeated engagement in high-risk behaviors.[1] We reject respondent's request for this court to reweigh the evidence. See *In re Commitment of Jackson*, 2017 IL App (3d) 170031, ¶ 29. In light of

---

[1]We acknowledge that the trial court was mistaken in stating, in its findings, that Glazier also testified regarding respondent's reoffense cycle. The trial court's mistake does not invalidate or call into question the testimony of Meacham and Dr. Weitl.

respondent's consistent lack of transparency and express refusal to participate in the conditions of his release, we conclude the trial court did not abuse its discretion in revoking respondent's conditional release and recommitting him to the institutionalized setting.

¶ 42     Respondent next contends that the trial court erred in allowing Dr. Weitl's expert testimony. More specifically, respondent argues it was an abuse of the court's discretion to allow Dr. Weitl to testify to an opinion based on a nonstatutory standard. Respondent additionally argues that the trial court abused its discretion in allowing Dr. Weitl to testify, despite her failure to maintain her notes from interviews with Meacham and respondent. Respondent finally argues the trial court erred in admitting Dr. Weitl's opinion testimony where it was not previously disclosed in conjunction with the Rule 213 written interrogatory.

¶ 43     The admissibility of expert testimony is within the sound discretion of the trial court. *Thompson v. Gordon*, 221 Ill. 2d 414, 428 (2006). "A person will be allowed to testify as an expert if his experience and qualifications afford him knowledge that is not common to laypersons, and where his testimony will aid the trier of fact in reaching its conclusions." *Id.*

¶ 44     Respondent challenges the admission of Dr. Weitl's testimony as an expert where she testified to a "made up" standard used to determine that respondent's conditional release should be revoked. Respondent specifically takes issue with Dr. Weitl's opinion, as written in her June 2015 report, that respondent's "progress in treatment [wa]s insufficient for him to continue to be safely managed and treated in the community on conditional release."

¶ 45     We find there was no abuse of discretion in admitting Dr. Weitl's expert opinion. There is no dispute that Dr. Weitl had the experience and qualifications providing her knowledge uncommon to laypeople. Additionally, there is no dispute that her knowledge and qualifications aided the trial court in reaching its conclusion. Moreover, the record was clear that Dr. Weitl was familiar with respondent's case after having performed eight annual reevaluations of his SVP status. The dispute is whether Dr. Weitl's opinion was relevant because she used nonstatutory language in rendering that opinion. Respondent does not cite any cases, and we are unaware of any, that require an expert to constrain his or her opinion to precise statutory language. Additionally, contrary to respondent's argument, there is nothing in the record to suggest that Dr. Weitl created a new standard for determining whether revocation was required. Instead, Dr. Weitl's June 2015 report and her testimony at the revocation hearing consistently complied with the statutory requirement for the revocation of conditional release. More specifically, Dr. Weitl, both in her report and at the hearing, repeatedly discussed respondent's condition violations, which formed the basis of his conditional release revocation. See 725 ILCS 207/40(b)(4) (West 2012). In addition to those findings, Dr. Weitl expressed her opinion that respondent's "progress in treatment [wa]s insufficient for him to continue to be safely managed and treated in the community on conditional release." Considering the challenged opinion in light of the testimony directly establishing the statutory requirement for revocation, we find respondent failed to establish the trial court abused its discretion in admitting Dr. Weitl's expert opinion.

¶ 46     We additionally find respondent cannot demonstrate the trial court abused its discretion in allowing Dr. Weitl to testify regarding her interviews of Meacham and respondent where she failed to maintain her notes from those interviews. Dr. Weitl addressed her process following reexamination, such that she destroyed the notes from her interviews once she drafted her written reexamination report. Dr. Weitl clarified that all of the information from her notes was included in the report. Respondent fails to argue what, if any, relevant information may have

been contained in the doctor's notes in addition to that which appeared in her report. To the extent respondent wished to, and did, challenge Dr. Weitl on the interviews and the veracity of her report, the expert was available for cross-examination. The supreme court adopted Federal Rule of Evidence 705 in *Wilson v. Clark*, 84 Ill. 2d 186 (1981). In January 2011, the Illinois Rules of Evidence became effective, including Illinois Rule of Evidence 705, which is nearly identical to the federal version. See Ill. R. Evid. 705 (eff. Jan. 1, 2011). The rule provides, " '[t]he expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise.' " *Wilson*, 84 Ill. 2d at 194 (quoting Fed. R. Evid. 705). The supreme court explained, "[u]nder Rule 705 the burden is placed upon the adverse party during cross-examination to elicit the facts underlying the expert opinion." *Id.* We, therefore, find the trial court did not abuse its discretion in allowing Dr. Weitl to testify about the challenged interviews.

¶ 47    We finally conclude the trial court did not abuse its discretion in finding that the State did not violate Illinois Supreme Court Rule 213.When asked by the State whether the safety of others required the revocation of respondent's conditional release, Dr. Weitl responded in the affirmative. Respondent argues Dr. Weitl's response was a violation of Rule 213 because the State did not disclose that testimony.

¶ 48    When using an independent expert witness, Rule 213(f)(2) requires the party to identify the subjects on which the witness will testify and the opinions the party expects to elicit. Ill. S. Ct. R. 213(f)(2) (eff. Jan. 1, 2007). "An answer is sufficient if it gives reasonable notice of the testimony, taking into account the limitations on the party's knowledge of the facts known by and opinions held by the witness." *Id.*

¶ 49    The State's Rule 213 interrogatory provided that Dr. Weitl's "reports have previously been disclosed to respondent containing her opinions and the bases for her opinions. ***. She will be testifying in the areas of forensic psychology as well as the evaluation and treatment of sex offenders. Dr. Weitl may offer an opinion that she believes respondent's conditional release should be revoked." As stated, Dr. Weitl's June 2015 report provided that respondent's "progress in treatment [wa]s insufficient for him to continue to be safely managed and treated in the community on conditional release." Moreover, in both its initial and amended revocation petitions, the State alleged, "in accordance with the opinion of Dr. Weitl, the safety of others in the community requires that Respondent's conditional release be revoked." We conclude the State sufficiently disclosed Dr. Weitl's testimony, such that respondent was given reasonable notice of the testimony. We, therefore, find there was no abuse of discretion.

¶ 50                                          CONCLUSION
¶ 51    We affirm the judgment of the trial court in revoking respondent's conditional release.

¶ 52    Affirmed.