2020 IL App (1st) 181232-U

No. 1-18-1232

SIXTH DIVISION
JUNE 30, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* COMMITMENT OF ANTWONE STEWARD, a Sexually Violent Person, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | |
| Petitioner-Appellee, | ) ) | No. 98 CR 80005 |
| v. | ) ) | |
| ANTWONE STEWARD, | ) ) | Honorable Peggy Chiampas, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE Cunningham delivered the judgment of the court.
Justices Connors and Harris concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm the trial court's judgment revoking the respondent's conditional release where the State presented clear and convincing evidence that the safety of others required revocation.

¶ 2   The respondent-appellant, Antwone Steward, was civilly committed as a "sexually violent person" in 1998 under the Sexually Violent Persons Commitment Act (the Act) (725 ILCS 207/1

*et seq.* (West 1998)). The trial court conditionally released the respondent in 2016. Following an April 2018 hearing on the State's petition to revoke the conditional release, the trial court revoked the respondent's release, concluding that the "safety of others," a standard identified in the Act (725 ILCS 270/40(b)(4) (West 2016)), required revocation. On appeal, the respondent contends that the trial court's finding that the safety of others required revocation of his conditional release was against the manifest weight of the evidence. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 3                                             BACKGROUND

¶ 4      In 1992, the respondent was convicted of aggravated criminal sexual assault of two children for which he received an eight-year sentence. On May 13, 1998, prior to respondent becoming eligible for mandatory supervised release, the State sought to have the respondent civilly committed as a sexually violent person (SVP) under the Act.[1] He had been diagnosed with pedophilia, alcohol dependence, substance abuse, antisocial personality disorder, and borderline personality disorder. In 2000, the respondent was found to be a SVP. He was civilly committed to the control, care, and treatment of the Department of Human Services (DHS) and institutionalized in a secure facility where he received treatment.

¶ 5      On April 13, 2016, the respondent was placed on conditional release after the parties filed an agreed order. The agreed order was based on the opinions of two DHS doctors, who concluded that the respondent had made sufficient progress in treatment. The trial court approved a 59-condition treatment plan. Condition 6 of the respondent's treatment plan required him to "[a]ttend

_____

[1]If a court determines that a person is a SVP pursuant to the Act, the court shall order the person to be committed to the custody of the Department of Human Services for control, care, and treatment until such time as the person is no longer a SVP. 725 ILCS 207/40(a) (West 2016).

and fully participate in assessment, treatment and behavioral monitoring." Condition 55 required the respondent to "[r]efrain from watching out any/all windows of residence for sexual gratification." Following the language of the Act, the respondent's plan provided that his conditional release would be revoked if his conditional release agent believed he "failed to abide by any condition of his release plan" or if "the safety of others" required revocation. See 725 ILCS 207/40(b)(4) (West 2016). The respondent signed and initialed a certification of compliance indicating that he understood the plan and that his conditional release would be revoked if he failed to abide by the plan.

¶ 6    At a July 15, 2016, hearing, the State informed the trial court that the respondent was "doing fine. He did pass his polygraph exam. He has been doing treatment."

¶ 7    On April 18, 2017, during a hearing on the [State's] motion for periodic review, the parties stipulated "to the finding of no probable cause" to believe that the respondent was no longer a SVP. Defense counsel informed the trial court that a November 26, 2016, report from Dr. Amy Louck Davis, a SVP evaluator for DHS, indicated that she "opine[d] *** [the respondent] remain[ed] a sexually violent person but should remain on conditional release." The State added that the respondent "had a few issues on conditional release, but he's doing okay for now."

¶ 8    On July 12, 2017, the parties reiterated the above stipulation. The State added that the respondent was "doing reasonably well on [conditional release]." The trial court entered an order stating that there was no probable cause to believe the respondent was no longer sexually violent.

¶ 9    On August 16, 2017, the State filed an emergency *ex parte* petition for a body attachment, asserting DHS informed the State that the respondent could no longer be safely managed in the community. The State's petition averred that, according to DHS, a series of events led to that

conclusion. The most recent incident involved the respondent reporting, prior to August 1, 2017, that he had observed an eight-year-old male child playing outside his apartment and "stroked his penis" while watching the child on more than one occasion. At a polygraph test on August 1, 2017, the respondent was asked if he touched or spoke with the child. The respondent answered "no" to each question, and those answers were found to be deceptive. At the hearing on the petition, the trial court found that the State failed to establish that the petition was an emergency and denied it.

¶ 10    On August 18, 2017, the State filed a "Petition to Revoke Conditional Release," arguing that the respondent violated condition 6 of his conditional release plan by "demonstrating a pattern of withholding pertinent information." Specifically, the State listed numerous instances where the respondent failed to promptly reveal that he had been having more frequent sexual fantasies and desires than he had previously reported. The fantasies and desires were about individuals, including minors, whom he had seen in public or watched from his apartment. The State also listed several polygraph examinations where the respondent had given answers indicative of deception.

¶ 11    The State additionally argued that the respondent violated condition 55 of his conditional release plan by watching a neighbor come and go through the window and the peep hole of his apartment door. He admitted to having fantasies about the woman and imagined a relationship between them, resulting in his window being "snowed" by DHS, which prevented him from looking out his window, and receiving a letter of admonishment from DHS in March 2017. Additionally, the respondent reported in June 2017 that he fantasized about minors and masturbated more frequently than previously reported. He disclosed that he had looked out his window to observe an eight-year-old boy and " 'stroke[d]' his penis." His polygraph answers to questions regarding his involvement with the minor boy indicated deception.

¶ 12    Finally, the State argued that the respondent's "lack of transparency, his withholding of pertinent information and his inability to accept the things his [case management team] suggests makes him dangerous. The safety of the [r]espondent and of others in the community requires that [the] [r]espondent's conditional release be revoked."

¶ 13    On September 26, 2017, the respondent filed a motion to dismiss the State's petition to revoke his conditional release. In his motion, the respondent argued that the State failed to state claims upon which relief could be granted because it failed to allege that: (1) he did not attend or participate in treatment in violation of condition 6 of his conditional release plan; (2) he watched individuals through his window for the purpose of sexual gratification in violation of condition 55 of his plan; and (3) any expert opined that the safety of others required revocation of his conditional release.

¶ 14    On November 22, 2017, a different trial judge granted the State leave to refile its previously denied emergency petition for body attachment. The State attached to the emergency petition, its petition to revoke respondent's conditional release and an updated examination report from Dr. Davis, dated November 16, 2017. Following a hearing, the trial court granted the State's petition for a body attachment and issued an emergency order that the respondent be taken into DHS custody until the trial court ruled on the State's petition to revoke his conditional release.

¶ 15    On November 28, 2017, the State filed an amended petition to revoke the respondent's conditional release, and the respondent withdrew his motion to dismiss. The State's amended petition referenced the previously filed petition and stated, "[a] copy [of the original petition] is attached hereto as Exhibit A and is incorporated herein." Also attached to the amended petition was a report from Dr. Davis, dated November 16, 2017. In the amended petition, the State cited

the November 16, 2017, report and argued that the respondent demonstrated a "continuing pattern of increasing risk while in the community. This has been explained in detail in the Petition to Revoke Conditional Release. See Exhibit A." The State added that Dr. Davis, as the evaluator assigned to the respondent for his annual review, opined that he could not be safely managed in the community and that he is "a great risk today." The State asserted that DHS, the respondent's conditional release treatment team, and Dr. Davis all "alleged that the safety of the [r]espondent and others requires that conditional release be revoked."

¶ 16    On April 5, 2018, the trial court held a hearing on the State's amended petition. The parties stipulated that Dr. Davis was an expert in the area of sex offender evaluation with a specialty in risk assessment and evaluation. Dr. Davis testified that she worked as a SVP evaluator for DHS and was a licensed psychologist and sex offender evaluator. Dr. Davis had evaluated the respondent in December 2016 and November 2017. She met with him personally during the November 2017 evaluation for his annual reevaluation. The purpose of the evaluation was to make a recommendation about whether the respondent could be maintained on conditional release or if there were issues that needed to be addressed. Part of the evaluation consisted of a clinical interview, a "thorough record review including historical record and recent records regarding individual treatment, arrests, any background information," and an interview with the respondent's current treatment provider. Dr. Davis additionally reviewed the testing that had been completed with the respondent, including polygraph examinations and dynamic risk assessments. She also completed risk assessment measures. Following the evaluation, Dr. Davis wrote a report.

¶ 17    Dr. Davis identified her report, which was written on November 16, 2017. Prior to trial, to ensure her diagnoses and opinions reflected in the report were unchanged, she reviewed the clinical

progress notes available from the respondent's treatment detention facility. Dr. Davis diagnosed the respondent, within a reasonable degree of psychological certainty, with pedophilic disorder, other specified personality disorder, substance abuse disorder, and mild intellectual disability. Pedophilic disorder involves sexual attraction that includes urges, feelings, fantasies, and behaviors towards individuals that are prepubescent, "[t]ypically, age 13 and order [*sic*] by a person that's age 16 or over and at least 5 years older than the person they're attracted to." The respondent had past convictions of sexually offending against children as young as age three. He experienced "ongoing deviant sexual arousal [to] prepubescent children" and had reported continued sexual arousal toward children in the past year.

¶ 18      The respondent's personality disorder led to his general attitude toward "criminal things," a sense of paranoia, and difficulty with managing relationships and emotions, which all "come together" and "make it difficult sometimes for him." An example of his personality disorder was the respondent's reaction to his case management team's decision to not allow him to visit his family because certain family members did not meet the requirements of the conditional release rules. The respondent blamed his team and did not trust them as much. His "activities of daily living knowledge and understanding of how to live a mature adult experience" were impaired due to his intellectual deficits.

¶ 19      Dr. Davis conducted a risk assessment, using the actuarial risk assessment tools, the static 99R and the static 2002R.[2] She also utilized the STABLE 2007, which she described as a "measure of criminal," and used it to supplement the static measures to help place the respondent in a

_____

[2]Specifically, the static 99R and the static 2002R are psychological evaluations which mainly focus on a person's historical conduct to predict the person's likelihood of sexually reoffending.

reference group for comparison purposes. Based on the respondent's score on the STABLE 2007, Dr. Davis used the "high risk high need" reference group for him.

¶ 20     Dr. Davis explained that the actuarial instruments "speak to [the respondent's] likelihood for re-offense or sexually reoffending." The respondent had an above to well-above average risk of reoffending compared to other sex offenders. On the static 99R, the respondent scored in the "above average" risk range, which is compared to the average sex offender in prison. In other words, in comparison to high risk, high needs offenders in the average range, the respondent scored higher than average. On the static 2002R, the respondent scored two steps above average, in the "well above average" range. The respondent's risk is considered "static in nature, so it is expected to have very, very little change," although age can be a factor that dilutes risk.

¶ 21     Dr. Davis identified dynamic risk factors that applied to the respondent. Dynamic risk factors are "things that can be [a]ffected with treatment, with time, with environmental changes" and things that "have the opportunity to change and improve." She stated, "For [the respondent] there are a couple of factors that are particularly high [which] correlates with risk of re-offense that are now present that weren't present in the past." The respondent's highest risk factor, "that is a major indicator for future re-offense," was noncompliance with supervision. Under this risk factor, the respondent failed to: (1) follow rules and treatment recommendations; (2) disclose information to his treatment providers; (3) complete homework assignments; and (4) meaningfully participate in his treatment.

¶ 22     Other risk factors that were "particularly increased for [the respondent]" were his sexual preoccupation and ongoing deviant sexual interest. He had several incidents during his conditional release of "increased masturbation, increased sexual arousal and sexual fantasizing about

inappropriate or sexually deviant material." In particular, the respondent watched and fantasized about an eight-year-old boy. He had "deviant sexual fantasies" about the minor and "masturbate[d] to those."

¶ 23    The respondent additionally exhibited more moderate risk factors, including poor problem solving, not knowing how to handle difficult situations, having some impulsivity in decision-making, and having an ongoing pro-criminal attitude. Moderate risk factors are "associated with precursors to sexual offending" and were seen in the respondent's distorted thinking, "hoping he can just get away with something and then everything will be okay or if he covers up something or doesn't tell, then maybe he won't get in trouble for it."

¶ 24    Dr. Davis testified that there were several protective factors that could lower the respondent's risk, including age, debilitating illness, and treatment completion. She took the respondent's age (43 years old) into consideration when determining his overall risk assessment. His actuarial risk scores were lowered due to his age. She did not consider the second protective factor because it did not apply to the respondent. Regarding the third protective factor, Dr. Davis considered the respondent's 18 years of treatment and completion of a five-phase treatment program. The respondent's treatment was particularly relevant when he was recommended for conditional release. She added,

> "It's sort of a protective factor to make a decision to try him out on conditional release. However, because of the sharp increase and the dynamic factors that we talked about, the strength of that protective factor doesn't hold enough to continue to support ongoing conditional release."

¶ 25    In forming her opinion, Dr. Davis relied on the respondent's violation reports which were made over the course of his conditional release. Several events contributed to the respondent's ultimate violation report. He was "having difficulty complying with expectations related to being transparent and disclosing necessary information for the [case management team] to adequately monitor his risk and safety of the community." The necessary information related to "his sexual arousal to people he was seeing in the community" and "his sexual behaviors related to the people he was seeing." The respondent also had difficulty managing his relationships with his conditional release agent and therapist.

¶ 26    While on conditional release, the respondent received verbal redirection from his therapist and conditional release agent. Initially, the respondent received a letter of understanding in December 2016, related to several incidents where he failed to report information that was "highly relevant" to their ability to manage his risk and safety of the community. He had interacted with a female neighbor in his apartment complex and failed to immediately report that contact, as he was required to do. That interaction was of "particular concern" because the female neighbor supposedly asked the respondent if "he could get some drugs or something related to that." The respondent discussed his reaction to the incident, which had been problematic because he stated that "if he had been in another circumstance maybe he would have considered using drugs or participating in finding drugs with his female neighbor."

¶ 27    In March 2017, the respondent had observed several "young teens" in a store on different occasions. He "objectified them and proceeded to develop sexual fantasies and masturbated on several occasions all while not reporting" the incidents, as required. A June 2017 violation report showed the respondent also observed, through his window, a young boy in his apartment complex

on multiple occasions. He developed sexually deviant fantasies about the boy and masturbated. The respondent failed to report the incidents or to use interventions from his treatment.

¶ 28    Dr. Davis testified that she reviewed the reports of the respondent's polygraph examinations as part of her evaluation and considered them as part of her opinion. Polygraph examinations are used as a treatment tool to ensure that an individual discloses information. The respondent completed three polygraph examinations in January 2017, May 2017, and August 2017, respectively. The first two polygraphs were "split in the results" and indicated there was deception on some questions and no deception on others. On each exam, the respondent showed no deception when he was asked about having anyone come into his apartment or going into another's apartment. However, the tests showed deception on questions relating to having masturbated to sexual thoughts of a child. Those topics were relevant to the respondent's treatment and related to Dr. Davis' "ultimate concerns about the dynamic risk factors related to deviant sexual interest that *** flow from how the polygraph lead [*sic*] into treatment lead [*sic*] to [her] consideration."

¶ 29    On the final polygraph, the respondent was asked specifically about the events involving the eight-year-old boy he had seen around his apartment complex. The questions were "roughly" about whether he touched or spoke with the child. The respondent answered "no" to the questions, and the test showed deception in his answers. These results showed that the issue required further investigation. Dr. Davis explained that "the treatment is going to be why do you think you're showing deception on this[?] What is going on in your mind[?] What's processing behind the scenes about this[?] And what are your concerns about your arousal[?]"

¶ 30    The respondent's treatment team was tasked with caring for the respondent's needs and protecting the community. Because the respondent was a high-risk offender, the risk to the

community was managed through the rules of conditional release. The rules were "very specifically laid out to assist the case management team" and to ensure that the respondent was being treated and that the community was being protected. The rules imposed expectations on the respondent to assist in the management of his care and safety of the community. One such expectation was the requirement that the respondent provide information about his sexual behavior, his urges, his thoughts, his masturbation behavior, and his contact with others in the community. His team required this information to treat him, as well as to design an intervention to teach him.

¶ 31    Dr. Davis' opinion, within a reasonable degree of psychological certainty, was that the respondent could no longer be safely managed in the community. The respondent presented a danger to the community, due to the "sharp increase in risk related to the dynamic case risk factors, combined with his already existing high risk status as a high risk for re-offense." She was also of the opinion that the respondent remained sexually violent and was not ready for discharge.

¶ 32    On cross-examination, Dr. Davis testified that she conducted an annual evaluation for the respondent in November 2016, and its purpose was the same as the one conducted in November 2017. The respondent's diagnoses were the same after both evaluations. The respondent's scores from both the static 99R and the static 2002R were identical in both the 2016 and 2017 evaluations. The dynamic risk factors that Dr. Davis identified in the 2017 evaluation, including noncompliance with supervision, sexual preoccupation, deviant sexual interest, poor problem-solving skills, impulsivity, and a pro-criminal attitude, among others, were also identified in the 2016 evaluation. In both evaluations, she placed the respondent in the high risk, high need reference group.

¶ 33    The respondent continued with treatment while he was on conditional release. He was physically present at his treatments, but Dr. Davis noted that "at times" he spoke with his therapist and "sometimes he withheld." She acknowledged that most of the information she testified to came from treatment notes from the respondent's therapist, which were compiled after the respondent participated in treatment.

¶ 34    Regarding the respondent's intellectual ability, Dr. Davis testified that she had diagnosed him with "mild intellectual ability," and his intellectual functioning had been known to DHS since he began treatment in 2001. During the course of his treatment, he had been placed in specialized programming in an adaptive environment to help with his intellectual issues.

¶ 35    Dr. Davis acknowledged that, with respect to the respondent's substance abuse disorder, he was in remission and had no reports of drug or alcohol abuse while out on conditional release. She further acknowledged that while she used the polygraph test results in the course of reaching her opinions, she agreed that there was "some controversy" surrounding them. She did not have information regarding whether there were studies to validate the use of polygraph tests. She "could not speak" to whether there was research that identifies unique physical reactions indicative of deception and was not sure of specific concerns relating to using polygraphs on individuals with intellectual disabilities.

¶ 36    In response to questioning by the trial court, Dr. Davis testified that part of what she considered in her evaluation was the respondent's failure to report the incidents from December 2016, March 2017, and June 2017, in which he interacted with his female neighbor, watched young teenagers in a store and exhibited sexual fantasies, and watched the boy in his apartment complex.

She clarified that those incidents were examples and not a comprehensive list of the respondent's offenses. The trial court then inquired:

"And I guess my question to you is: did this in your opinion was this an escalation? Is that -- would that be the correct word or what is your opinion regarding these incidents?

DR. DAVIS: I think escalation is a fair term. The term that comes to mind is he indulged further and further into his sexual deviance.

And so it started with a happenstance occurrence, you know, running into this female in the hallway. She's the one that initiated the conversation about, you know, drugs.

And it was evidence kind of a criminal thinking, distorted thinking.

***

Then it evolved into seeing some teenage girls which it's not surprising he might have arousal to that, but he's expected to manage that. He did it. He let it go.

Didn't report in the timely manner to his team. And then we're into -- and so it's kind of like, you know, letting that take hold.

THE COURT: And not reporting?

DR. DAVIS: Not reporting -- he reported eventually on all sorts of different points in time to different people. It's very confusing to piece it all together. That's how we know as [defense counsel] pointed out, but it was not in the required manner of reporting."

¶ 37    On continued cross-examination, Dr. Davis acknowledged that, in her reports, she did not describe the respondent's behavior as an "escalation" or "further indulgence." Rather, she clarified she used "the term [']sharp increase['] which was [her] reference to this escalation, indulgence increase that the sharp increase specific to the dynamic risk factors that are related to those

behaviors." Deviant sexual arousal was a dynamic risk factor that had a "sharp increase" and had been "present for [the respondent] prior to his SVP." Dr. Davis, however, saw "much more of the deviant sexual arousal" which was why she described it as increasing from 2016 to 2017. She further clarified that when she described an increase in dynamic risk factors, she was not referring to the number of risk factors overall. Rather, she meant "the quality of the factors is more present. So there's more deviant sexual arousal than there was the year before. *** There is a higher amount of sexual preoccupation."

¶ 38      In closing argument, defense counsel argued that the hearing was on the State's amended petition, which only alleged one basis for revocation: safety of the community. Citing *In re Commitment of Rendon*, 2014 IL App (1st) 123090, defense counsel argued there was no evidence presented that showed the respondent was a present risk to the community. Defense counsel noted that Dr. Davis testified to a series of incidents in 2017, but no evidence showed he was a present risk at the time of the hearing, in April 2018. Thus, according to defense counsel, the State failed to meet its burden of clear and convincing evidence. Defense counsel further argued that, although the respondent was not "disclosing in a timely enough fashion," he did ultimately disclose the incidents to his team and his delay could be attributed to his intellectual disabilities. Again, relying on *Rendon*, defense counsel argued the respondent's deviant thoughts were insufficient, on their own, to show he was a risk to the community.

¶ 39      In rebuttal, the State first argued that it referenced and included its original petition with the amended petition. Nevertheless, the State agreed with defense counsel that the "real issue" was the safety of the community, but also argued that it proved the "respondent was not fully engaged in treatment as required by section 6 of his conditional release plan." With respect to violating the

treatment plan, the State noted that the respondent should have disclosed his fantasies before masturbating in relation to those fantasies, and therefore the evidence showed he had not been fully participating in treatment. Further, the respondent violated his treatment plan by looking at a young boy through his window, having deviant sexual fantasies about the boy, and then masturbating in relation to them.

¶ 40     With regard to the threat to the community, the State argued that Dr. Davis' testimony established the respondent's increase in dynamic risk factors and that "those are a bigger problem for him now than they were when he was in the treatment at the detention facility."

¶ 41     Following arguments, the trial court concluded that Dr. Davis' testimony was clear and convincing evidence that the respondent could not be safely managed in the community and "was not reporting significant incidents." The trial court granted the State's motion to revoke conditional release. The trial court specifically mentioned that the State's amended petition incorporated its original petition, and therefore the trial court was "incorporating both of them." The trial court found the instant case distinguishable from *Rendon* because "Dr. Davis testified [] specifically as to the dynamic factors that a risk factor being present now, but not in the past." The trial court noted Dr. Davis' testimony regarding the respondent's noncompliance with supervision, the "sharp increase" in his sexual preoccupation and sexual deviant interests while on conditional release, and his failure to report. In recounting Dr. Davis' testimony, the trial court stated, "the issue is that these violations of conditional release were not reported by [the respondent] as he was obligated." The trial court made clear it was only considering the polygraph results for the limited purpose "of evidence as to Dr. Davis using that information. Not the validity of the polygraph itself, but the

information generated from that in arriving in her -- or taking part of her evaluation and ultimately arriving to the conclusion that she did."

¶ 42   The trial court emphasized the respondent's failure to report significant incidents, which Dr. Davis considered when forming her opinion. It noted "the specifics of the conditional release rules offered to [the respondent] and expectation by him to present that information to his team. And had he done so in a timely manner, we may not be here at this time." The trial court found the "sharp increase in risk factors from the teenaged girls in the store to the 8-year-old child in his building that he was watching and exhibited sexual fantasies about and masturbated to, that this court does find that the risk of the respondent reoffending is substantially probable."

¶ 43   Following the revocation of his conditional release, the respondent appealed.

¶ 44                                          ANALYSIS

¶ 45   We note that we have jurisdiction to consider this matter, as the respondent filed a timely notice of appeal. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 303 (eff. July 1, 2017).

¶ 46   On appeal, the respondent argues the trial court's finding that the safety of others required revocation of his conditional release was against the manifest weight of the evidence. He argues that the State failed to prove by clear and convincing evidence that his conditional release should be revoked because: (1) his failure to report masturbation to deviant fantasies was "not necessarily" a basis to conclude that the safety of others required revocation; (2) the State did not show that the safety of others was threatened by the respondent being on conditional release; and (3) even if the respondent's past failures to immediately disclose made him a threat to the safety of others, the State did not show that the respondent presented a threat to others at the time of the hearing.

¶ 47    Under the Act, a SVP is a "person who has been convicted of a sexually violent offense and who is 'dangerous' because he 'suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence.' " (Emphasis omitted.) *Rendon*, 2014 IL App (1st) 123090, ¶ 21 (citing 725 ILCS 207/5(f) (2010)). The Act defines a mental disorder as a "congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2016). Proceedings under the Act are civil in nature, but the State is still required to prove beyond a reasonable doubt that a person is a SVP. *Rendon*, 2014 IL App (1st) 123090, ¶ 21. Once an individual is proved to be a SVP, he is "committed to the custody of DHS for control, care, and treatment 'until such time as the person is no longer a sexually violent person,' which could hypothetically only end upon death." *Id.* (quoting *In re Detention of Stanbridge*, 2012 IL 112337, ¶¶ 48, 50).

¶ 48    After a SVP is institutionalized in a secure facility in order to receive treatment, he is reexamined yearly to determine whether he has made sufficient progress to be conditionally released. *In re Commitment of Tunget*, 2018 IL App (1st) 162555, ¶ 31. If conditionally released, the SVP "remains within the custody and control of the DHS and is subject to the conditions set by the trial court and the DHS." *Id.* ¶ 32. The conditions require the SVP to "attend and fully participate in assessment, treatment, and behavior monitoring, including, but not limited to, medical, psychological, or psychiatric treatment specific to sex offending to the extent appropriate and based on DHS recommendations." *Id.* The SVP must additionally comply with any other special conditions that the DHS imposes which restrict him from "high-risk situations" and limit "access or potential victims." 725 ILCS 207/40(b)(5)(BB) (West 2016). Where the DHS alleges

"that a released person has violated any condition or rule, or that the safety of others requires that conditional release be revoked, he or she may be taken into custody under the rules of the [DHS]." 725 ILCS 207/40(b)(4) (West 2016).

¶ 49    During a proceeding to revoke a conditional release, the State is required to prove "by clear and convincing evidence that any rule or condition of release has been violated, or that the safety of others requires that the conditional release be revoked." *Id.*; *Tunget*, 2018 IL App (1st) 162555, ¶ 33. " 'Clear and convincing evidence is defined as the quantum of proof that leaves no reasonable doubt in the mind of the fact finder as to the veracity of the proposition in question.' " *Rendon*, 2014 IL App (1st) 123090, ¶ 32 (quoting *In re Gloria C.*, 401 Ill. App. 3d 271, 282 (2010) (overruled on other grounds by *In re Rita P.*, 2014 IL 115798)). Revocation is required where the respondent's risk of re-offense is substantially probable. *Id.* ¶ 30. The risk of re-offense and the threat to the safety of others "presents itself when the respondent's mental illness is not effectively treated." *Id.* ¶ 31.

¶ 50    "[T]he inquiry in a revocation proceeding relating to the 'safety of others' may specifically focus on the respondent's progress, or regression, in treatment." *Id.* Because the purpose of the Act "anticipates and aims to prevent sexual dangerousness stemming from mental illness," the threat to the safety of others need not be based on "overt acts of sexual violence." *Id.* Indeed, the trial court is not required to wait until overt acts are committed or "ignore indications that certain rule violations can themselves represent a risk to the community." *Id.* However, whether the safety of others requires revocation of conditional release is "based on present danger (as opposed to past)." *Id.* ¶ 30.

¶ 51    As an initial matter, the parties disagree regarding the applicable standard of review. The respondent, relying on *Rendon*, 2014 IL App (1st) 123090, ¶ 32, argues the trial court's ruling on a petition to revoke conditional release should not be disturbed unless it is against the manifest weight of the evidence. The State, relying on *Tunget*, 2018 IL App (1st) 162555, ¶ 35, responds that there is a two-part standard of review: first, whether the trial court's factual findings were against the manifest weight of the evidence, and second, whether the trial court's ultimate decision to revoke the respondent's conditional release is an abuse of discretion.

¶ 52    We agree with the respondent that the standard of review is whether the trial court's ruling on a petition to revoke conditional release was against the manifest weight of the evidence. *Tunget* concerned only whether the trial court erred in finding that the respondent violated the conditions of his release and whether his conditional release should be revoked as a result. This court applied the two-part test in that context. *Tunget*, 2018 IL App (1st) 162555, ¶ 35. *Tunget* was not concerned with the trial court's factual finding "that the safety of others requires that the conditional release be revoked" (725 ILCS 207/40(b)(4) (West 2016)), which was the basis for the trial court's decision in the instant case. *Rendon*, on the other hand, as in the case at bar, specifically focused on that determination, and held the trial court's ruling "that the State established by clear and convincing evidence that the 'safety of others' required revocation of respondent's conditional release[ ] will not be disturbed unless it is against the manifest weight of the evidence, *i.e.*, where the opposite conclusion is clearly the proper result." *Rendon*, 2014 IL App (1st) 123090, ¶ 32. We therefore follow the standard of review set forth in *Rendon*.

¶ 53    Additionally, we note that the parties disagree about whether the allegations in the original petition that the respondent violated conditions 6 and 55 in his conditional release plan are at issue

in this appeal. The respondent argues that the State's amended petition superseded its original petition and, therefore, the allegations in the original petition that he violated conditions 6 and 55 of his release plan were abandoned by the State before the evidentiary hearing. In fact, the respondent does not argue that any findings regarding the violations of his conditional release were against the manifest weight of the evidence. We disagree with the respondent's conclusion. The State's amended petition expressly referenced the original petition several times, incorporated it, and attached it as an exhibit. The State argued, albeit briefly, during closing argument that the respondent violated the conditions of the conditional release plan. Moreover, the trial court's ruling noted that the original petition was incorporated and that it was "incorporating both of them."

¶ 54    That said, although the trial court did mention the violations of the respondent's conditional release plan, it did not specifically address whether the respondent violated conditions 6 and 55. The basis of the trial court's ruling was that the safety of others required revocation of the respondent's conditional release. Accordingly, we will review whether the court's ruling on that basis is supported by the record.

¶ 55    Turning to the merits of the respondent's argument, we find that the State presented clear and convincing evidence that the respondent constituted a threat to the safety of others. The evidence presented established that the respondent exhibited a "sharp increase" in risk factors that highly correlated with the risk of re-offense, including noncompliance with supervision, sexual preoccupation, and ongoing preoccupation with sexual deviance. In particular, the respondent failed to: follow rules and treatment recommendations; disclose information to his treatment providers; complete homework assignments; and meaningfully participate in treatment. The respondent had sexual fantasies about teenagers that he observed in a store. He also watched an

eight-year-old boy on multiple occasions and fantasized about the child while masturbating. He failed to report these incidents, which was required by and crucial to his team's ability to treat him and manage him in the community.

¶ 56 Dr. Davis specified that the respondent's dynamic risk factors were "more present" from 2016 to 2017, so she saw "much more" deviant sexual arousal and a "higher amount of sexual preoccupation." Dr. Davis was of the opinion that the respondent could no longer be safely managed in the community and was a threat to others due to the "sharp increase in risk related to the dynamic risk factors." Under these facts and circumstances, we cannot say that the trial court's conclusion that the respondent posed a threat to the safety of others was against the manifest weight of the evidence. It was for the trial court to determine the weight to be given to Dr. Davis' testimony, and nothing in the record or the law would require us to substitute our judgment for that of the trial court.

¶ 57 In reaching this conclusion, we reject the respondent's contention that *Rendon*, 2014 IL App (1st) 123090, mandates reversal. As the respondent points out, *Rendon* specifically held that the "safety of others 'requires' conditional release to be revoked based on present danger (as opposed to past)," *i.e.*, based on the danger that a respondent presents at the time of the hearing. *Id.* ¶¶ 30, 34, 36. Thus, in *Rendon*, we reversed the trial court's revocation of the respondent's conditional release where the respondent's therapist testified that, at the time of the evidentiary hearing, and after having been prescribed testosterone-lowering medication, respondent was "moving in the right direction." *Id.* ¶ 34. In that case, the respondent's fantasies of force had declined, he was not masturbating, he was making disclosures about sexual urges and, unlike previously, had passed the most recent polygraph exam. Thus, we concluded that the evidence

indicated that the respondent "might have posed a threat to the public" in the past but established he had improved and the threat had "apparently diminished by the time of the hearing." *Id.*

¶ 58 Unlike in *Rendon*, and contrary to the respondent's claim, in this case, the evidence established that the respondent was a threat to the public *at the time* of the hearing, and not merely that he posed a threat in the past. Also, unlike *Rendon*, there was no evidence presented to show that the threat the respondent posed had diminished. To the contrary, Dr. Davis testified at the hearing that the respondent posed a threat to the community and that there was a "sharp increase" in his sexual preoccupation and deviant sexual fantasies.

¶ 59 The respondent argues that Dr. Davis' opinion was based on her November 16, 2017, report, which she prepared approximately five months prior to the hearing. However, Dr. Davis was specifically asked whether she did anything to "ensure [her] diagnoses and opinions that are reflected in [her] report ha[d] not changed." Dr. Davis answered that she reviewed clinical progress notes that were available from the treatment detention facility regarding the respondent's treatment from the time that he was reinstitutionalized in November 2017. Her opinion remained unchanged at the time of the hearing. To the extent that the respondent challenges Dr. Davis' opinion, he had the opportunity to cross-examine her at the hearing. See *Tunget*, 2018 IL App (1st) 162555 ¶ 46 (relying on Illinois Rule of Evidence 705 (Ill. R. Evid. 705 (eff. Jan 1, 2011) and quoting *Wilson v. Clark*, 84 Ill. 2d 186, 194 (1981), to note that " 'the burden is placed upon the adverse party during cross-examination to elicit the facts underlying the expert opinion.' "). We accordingly reject the respondent's arguments and affirm the trial court's judgment revoking his conditional release.

¶ 60         CONCLUSION

¶ 61 For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 62 Affirmed.